

**FILED**

Jan 12 2017, 8:25 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Patricia Caress McMath
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill
Attorney General of Indiana

Robert J. Henke
James D. Boyer
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of: | January 12, 2017 |
| S.G., L.G., D.G., & A.W. | Court of Appeals Case No. 49A02-1607-JC-1611 |
| *Children in Need of Services* | |
| And | Appeal from the Marion Superior Court |
| S.S. (Mother), | |
| *Appellant-Respondent,* | The Honorable Heather Welch, Special Judge |
| v. | Trial Court Cause No. 49D09-1510-JC-3009, 49D09-1510-JC-3010, 49D09-1510-JC-3011 & 49D09-1510-JC-3012 |
| Indiana Department of Child Services, | |
| And | |
| Child Advocates, Inc. | |
| *Appellee (Guardian ad Litem).* | |

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Respondent, S.S. (Mother), appeals the trial court's determination that the Indiana Department of Child Services (DCS) need not undertake reasonable efforts to reunite her with four of her minor children—A.W., S.G., L.G., and D.G. (collectively, the Children)—following their adjudication as children in need of services (CHINS).

We affirm.

## ISSUES

Mother raises two issues on appeal, which we restate as follows:

(1) Whether Indiana Code section 31-34-21-5.6 is unconstitutional; and

(2) Whether the trial court abused its discretion by ordering that DCS was not required to undertake reasonable efforts to reunite Mother with her children.

## FACTS AND PROCEDURAL HISTORY

Mother is the biological parent of ten children: D.P., born January 12, 1996; J.R., born February 5, 1999; A.R., born September 4, 2001; A.W., born January 5, 2003; M.G., born March 1, 2004; A.G., born November 3, 2006; S.G., born October 7, 2011; L.G., born December 11, 2012; D.G., born

December 8, 2013; and I.K., born February 11, 2016. Six men have been identified as the fathers of these children.[1]

[5] The Marion County DCS first became involved with Mother and her family in February of 1999, when J.R. tested positive at birth for marijuana. DCS initiated an informal adjustment, and Mother successfully complied with her case plan. The case was closed in August of 1999. In February of 2002, DCS commenced an investigation after five-month-old A.R. perished in an apartment fire while Mother was not at home. DCS substantiated allegations of neglect against Mother, but it is unclear as to how that case proceeded.

[6] In March of 2003, D.P., J.R., and A.W. were adjudicated CHINS after Mother used a belt to whip seven-year-old D.P., resulting in a black eye. Mother admitted that her actions endangered the children and that she had failed to provide adequate supervision. Mother was directed to secure and maintain a stable source of income and suitable housing and participate in various services recommended by DCS, including, in part: home-based counseling, a parenting assessment, a psychological evaluation, a drug and alcohol assessment and substance abuse treatment, random drug screens, and visits with the children. Mother successfully completed her case plan and was reunited with D.P., J.R., and A.W. in June of 2004.

---

[1] The fathers of the Children at issue—A.W. Sr. (father of A.W.); S.G. Sr. (father of S.G.); and D.D.G. (father of L.G. and D.G.)—each admitted that their respective child/children are CHINS. The fathers are not parties to this appeal, but facts pertaining to them are included where appropriate.

In March of 2005, D.P., J.R., A.W., and M.G. were adjudicated CHINS following a finding that the children were endangered as a result of ongoing domestic violence in the home. In addition to the children witnessing the physical abuse of Mother by S.G. Sr., J.R.'s body was covered in bruises, A.W. had what appeared to be cigarette burns all over his body,[2] and D.P. was arrested for taking a firearm to school. Mother was again directed, in part, to secure and maintain a source of income and suitable housing and to complete services, most of which were the same as in the previous CHINS case: home-based counseling, a parenting assessment, parenting classes, a drug and alcohol assessment and substance abuse treatment, random drug testing, and visitation with the children. Mother was compliant with her case plan, her children were returned home, and the case was successfully closed in December of 2005.

Five months after being reunited with her children, in May of 2006, D.P., J.R., A.W., and M.G. were again adjudicated CHINS. In that case, Mother admitted to allegations of endangerment to the children and, in particular, that she had physically abused seven-year-old J.R., who sustained scratches on her eyes and bruising to her face, and that she had been convicted of Class A misdemeanor battery against D.P.[3] For the third time, Mother was ordered to

---

[2] According to Mother, A.W. was subsequently diagnosed with "a skin disease." (Tr. Vol. II, p. 247).

[3] Mother pled guilty pursuant to a plea agreement and was ordered to serve probation. Mother had a probation violation due to her substance abuse and was subsequently incarcerated. It also appears that Mother has a 2006 Class D felony conviction for battery against one of her children, for which she was incarcerated for "[m]aybe five or six months." (Tr. Vol. III, p. 85).

complete the same services as in her two prior CHINS cases. In addition, the trial court directed her to ensure that her school-aged children regularly attend school and that she participate in a program addressing issues of domestic violence. After A.G. was born in November of 2006, she was also adjudicated a CHINS because of Mother's violent history and because Mother's psychological evaluation indicated that the children would not be safe in her care. Mother completed all of the necessary services and was reunited with D.P., J.R., A.W., M.G., and A.G. in December of 2007.

[9] Less than a year later, in October of 2008, DCS took D.P., J.R., A.W., M.G., and A.G. into custody. However, no CHINS case was filed, and no services were ordered. Eight days after the children were detained, the case was dismissed. Then, in October of 2009, D.P., J.R., A.W., M.G., and A.G. were adjudicated CHINS after Mother admitted that she lacked the ability to appropriately parent the children without assistance and based on her issues with domestic violence and substance abuse. At the time, Mother was abusing crack cocaine, and DCS alleged that she, in the children's presence, struck S.G. Sr. in the back of the head. Once more, Mother was directed to, in part, secure and maintain a source of income and suitable housing, participate in home-based counseling, complete a parenting assessment, complete a psychological evaluation, undergo random drug testing and intensive outpatient drug treatment, and participate in a program to address her domestic violence issues. This time, Mother did not comply, and in April of 2011, the trial court granted DCS' request that it be able to pursue a reunification plan of adoption.

[10] In October of 2011, S.G. tested positive for cocaine at birth, and Mother admitted to cocaine use during the pregnancy. Mother left S.G. at the hospital, and in January of 2012, he was adjudicated a CHINS. Mother was ordered to participate in services. According to Mother, at that time, she "was a full blown crack head with no direction, no home, no nothing." (Tr. Vol. III, p. 24). She was unemployed, "living on the streets and in abandoned houses," and was stealing to feed her daily cocaine habit. (Tr. Vol. III, pp. 24-25). In February of 2012, Mother sought substance abuse treatment at the Dove Recovery House and remained there until October of 2012. In September of 2012, Mother had a relapse with cocaine. On October 22, 2012, Mother's parental rights to M.G. and A.G. were terminated.[4] In December of 2012, Mother gave birth to L.G., whose meconium tested positive for cocaine. As a result, in January of 2013, L.G. was also adjudicated a CHINS, and Mother was, again, directed to comply with DCS' recommended services. In November of 2013, Mother's case was closed and she was reunited with J.R., A.W., S.G., and L.G.[5]

[11] In May of 2014, J.R., A.W., S.G., L.G., and D.G. were removed from the home and adjudicated CHINS based on Mother's admitted failure to provide

---

[4] Notwithstanding Mother's criticism that an affirmation of this court "is worth the paper it's written on," we do note that our court affirmed the termination order pertaining to M.G. and A.G. in a memorandum decision issued on July 30, 2013. *In re M.G.*, No. 49A05-1211-JT-583, 2013 WL 3894158 (Ind. Ct. App. July 30, 2013), *trans. denied*. (Tr. Vol. III, p. 216). M.G. and A.G. were adopted in May of 2014.

[5] The record does not indicate the status of seventeen-year-old D.P. at the time.

appropriate supervision. In particular, DCS alleged that seventeen-month-old L.G. had an unexplained elbow fracture. Although not admitted by Mother as part of the CHINS adjudication, DCS also cited concerns about J.R.'s history of running away, as well as J.R.'s report to DCS that Mother physically abused all of the children. The trial court ordered Mother to participate in home-based case management services and therapy. By the summer of 2014, the children were returned home for a trial in-home visit, and Mother was actively participating in services. In December of 2014, the trial court closed the CHINS case with respect to A.W. and S.G, and in March of 2015, the trial court closed the CHINS case for J.R., L.G., and D.G.

[12] On September 7, 2015, sixteen-year-old J.R. was taken into DCS custody based on allegations that Mother was neglecting her. In particular, DCS received information that J.R. was homeless. J.R. reported that Mother had kicked her out of the home in April of 2015 and subsequently moved residences without informing J.R. J.R. was also nine weeks pregnant and did not have access to prenatal care. CHINS proceedings were commenced for J.R.

[13] The instant case arose on October 2, 2015, when the Marion County DCS received a report that Mother was physically abusing and neglecting the Children. In particular, the report alleged that twelve-year-old A.W. had run away from home after Mother "busted his head with a stick." (Appellant's App. Vol. II, p. 73). The reporting source further indicated that A.W. had not been seen for three weeks, and Mother was notifying her neighbors that he was dead. An anonymous neighbor informed DCS that Mother had stated that she

was happy that A.W. was dead because it relieved her of having to deal with him. In the complaint made to DCS, it was also reported that Mother "kicked [three-year-old S.G.] so hard he could not walk" and slapped one-year-old D.G., both of whom were purportedly covered in bruises. (Appellant's App. Vol. II, p. 73). It was also stated that Mother "hits all of her [C]hildren" with "whatever she can get her hands on." (Appellant's App. Vol. II, p. 74). Finally, the caller described to DCS that Mother, who was seven months pregnant with I.K. at the time, drinks alcohol all day long and spends any money that she has on cocaine and synthetic marijuana.

[14] On October 6, 2015, DCS made contact with Mother via telephone. The DCS family case manager identified herself to Mother, but Mother apparently believed she was speaking with someone at Eskenazi Hospital and began cursing and demanding that the call be transferred to the morgue because she needed to identify A.W.'s body. When DCS was finally able to make it clear to Mother with whom she was speaking, Mother stated that she would not speak to DCS and ended the call. Later that day, two DCS family case managers went to Mother's home, and although they could hear noises from inside the house, their knocking went unanswered. An officer from the Indianapolis Metropolitan Police Department (IMPD) arrived to assist DCS, at which time Mother "stumbl[ed]" from the back of the house. (Appellant's App. Vol. II, p. 74). Mother was belligerent and erratic, her words were slurred, and she was rambling, leading DCS to believe that she was under the influence of some type of substance. Mother indicated that she was grieving the loss of her murdered

son and that she had just returned from identifying A.W.'s body at the coroner's office. DCS informed Mother that there was no indication that A.W. had been murdered and that he was not at the coroner's office. When asked again whether she actually went to the coroner's office, Mother had no idea what the case manager was talking about, and she ordered DCS and IMPD to leave her property. DCS indicated that it needed to check on the Children, but Mother stated that she had given the Children away a month prior. Mother provided DCS with a phone number of the person who was supposedly caring for the Children. When DCS called that individual, she denied that the Children were in her care, instead stating that the Children were still living with Mother.

[15] On October 8, 2015, DCS filed a petition alleging the Children to be CHINS. In particular, DCS asserted that Mother "failed to provide the [C]hildren with a safe, stable, and appropriate living environment free from substance abuse." (Appellant's App. Vol. II, p. 70). DCS cited its "extensive history" with Mother and noted further concerns that Mother was refusing DCS access to the Children and that A.W.'s whereabouts were unknown. The same day, the trial court held an initial and detention hearing and ordered the Children's removal from Mother's home. The trial court stipulated that Mother could have supervised visitation with the Children. The trial court also appointed Child Advocates, Inc. to act as the Children's guardian ad litem (GAL). Immediately following the trial court's ruling, DCS, with the assistance of IMPD, removed S.G., L.G., and D.G. from Mother's home. At the time, DCS did not notice

any apparent bruising or other indications of physical abuse to the three youngest children. DCS placed S.G. with his paternal grandmother, whereas L.G. and D.G. were placed together in a therapeutic foster home. A few days later, DCS located A.W. Although A.W. was initially placed with his father, A.W. Sr., A.W. absconded on multiple occasions and, as such, was subsequently placed in a foster home.

[16] At a pre-trial hearing/continued initial hearing on October 15, 2015, DCS indicated that it would be pursuing an exception to the statute that requires reasonable efforts to reunify a parent with his or her children. Based on the fact that it was seeking an order for no reasonable efforts, DCS requested that Mother not be given visits with the Children. Mother objected and requested supervised parenting time. Although the trial court ordered visitation among the siblings, it determined that Mother should not have any visits. On December 9, 2015, DCS and the GAL filed a Joint Motion for Hearing on Reasonable Efforts Exception and requested that the trial court "enter an [o]rder pursuant to [Indiana Code section] 31-34-21-5.6 finding that reasonable efforts to reunify the [C]hildren with [Mother] . . . are not required." (Appellant's App. Vol. II, p. 155).

[17] On December 23, 2015, Mother filed a motion seeking visitation with the Children, and on January 12, 2016, she filed an objection to the joint petition by DCS and the GAL for the trial court to order no reasonable efforts. On January 20, 2016, the trial court held a hearing on the matter of Mother's requested visitation. On February 11, 2016, the trial court determined that "it is

not in the best interest of the [C]hildren that Mother have supervised parenting time and the [c]ourt does not believe that Mother will be in a position to regularly exercise this parenting time since she is on bed rest [due to her pregnancy]." (Appellant's App. Vol. III, p. 170).

[18] On February 11, 2016, Mother gave birth to I.K. Soon thereafter, DCS received a report concerning I.K.'s welfare and went immediately to the hospital to investigate. At that time, Mother admitted to DCS that she had relapsed and used cocaine. Accordingly, DCS removed I.K. from Mother's custody and initiated separate CHINS proceedings pertaining solely to I.K.

[19] On March 15, March 16, March 18, and March 21, 2016, the trial court conducted a fact-finding hearing and a hearing on DCS's petition regarding reasonable efforts with respect to the Children. On June 20, 2016, the trial court issued an Order, adjudicating the Children as CHINS and granting DCS' request that reasonable efforts are not required to reunify Mother with the Children. On July 14, 2016, the trial court conducted a dispositional hearing and filed its Dispositional Order on July 19, 2016. Pursuant to its determination that no reasonable efforts for reunification are required, the trial court did not order Mother to participate in any services.

[20] Mother now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

[21] Mother challenges the trial court's order that DCS need not undertake reasonable efforts to reunify her with the Children. In general, once a child has

been declared a CHINS, DCS is legally required to "make reasonable efforts to preserve and reunify families . . . to make it possible for the child to return safely to the child's home as soon as possible." Ind. Code § 31-34-21-5.5(b)(2). However, such reasonable efforts at reunification "are not required if the court finds . . . [that] [t]he parental rights of a parent with respect to a biological or adoptive sibling of a child who is a [CHINS] have been involuntarily terminated by a court." I.C. § 31-34-21-5.6(b)(4) (No Reasonable Efforts Statute).[6] In the trial court's Order adjudicating the Children to be CHINS, it found that reasonable efforts are not required based on the fact that Mother's parental rights to M.G. and A.G. were previously terminated. Mother now contends that "[t]his [N]o [R]easonable [E]fforts [S]tatute is unconstitutional as applied to [her] and is also void for vagueness." (Appellant's Br. p. 12) (internal quotation marks omitted). In the alternative, even if we find that the No Reasonable Efforts Statute is constitutional, Mother asserts that the trial court abused its discretion by applying it in this case.[7]

[22] Whether a statute is constitutional on its face is a question of law, which our court reviews *de novo*. *G.B.*, 754 N.E.2d at 1031. Statutes are "clothed in a

---

[6] The No Reasonable Efforts Statute does not relieve DCS of satisfying the remaining statutory procedures set forth for CHINS and termination of parental rights cases. *G.B. v. Dearborn County Div. of Family & Children*, 754 N.E.2d 1027, 1032-33 (Ind. Ct. App. 2001), *trans. denied*. Accordingly, even if DCS is not required to offer Mother services designed to reunify her with the Children, Mother's parental rights will not be terminated unless DCS can prove the elements set forth in Indiana Code section 31-35-2-4(b)(2). *Id.* at 1033.

[7] Mother does not dispute that the CHINS adjudications were based on sufficient evidence.

presumption of constitutionality." *Id.* Thus, an individual challenging the constitutionality of a statute bears the burden of rebutting this presumption. *Id.* "All reasonable doubts must be resolved in favor of an act's constitutionality. When a statute can be so construed to support its constitutionality, we must adopt such a construction." *Id.* (internal citation omitted).

### I. *Due Process When Fundamental Rights Are at Stake*

[23] Mother claims that the No Reasonable Efforts Statute "violates [her] substantive due process rights under the Indiana and United States Constitutions because it infringes upon her fundamental right to family integrity." (Appellant's Br. p. 13). Article 1, Section 12 of the Indiana Constitution provides that "every person, for injury done to him in his person, property, or reputation, shall have remedy by due course of law." Similarly, Section 1 of the Fourteenth Amendment to the United States Constitution stipulates that no State shall "deprive any person of life, liberty, or property, without due process of law." The analysis for federal and state substantive due process claims is identical. *G.B.*, 754 N.E.2d at 1031. In order to succeed on her claim, Mother "must show either that the [No Reasonable Efforts Statute] infringes upon a fundamental right or liberties deeply rooted in our nation's history or that the law does not bear a substantial relation to permissible state objectives." *Id.*

[24] Our courts have long recognized that parents have a fundamental right to family integrity, and "the right to raise one's children is essential, basic, more precious than property rights, and within the protection of the Fourteenth

Amendment to the United States Constitution." *Id.* As a result, "we must strictly construe" the No Reasonable Efforts Statute. *Id.* Under this standard, the Reasonable Efforts Statute "must serve a compelling state interest and be narrowly tailored to serve that interest." *Id.* at 1032.

[25] Our court has previously analyzed the No Reasonable Efforts Statute and concluded that "it does not violate substantive due process under the Indiana and United States Constitutions." *Id.* Although a parent does have a fundamental right to rear her child without undue governmental interference, the State also has a compelling interest in protecting that child's welfare. *Id.* In fact, it is well established that "[w]hen parents neglect, abuse, or abandon their children, the state has the authority under its *parens patriae* power to intervene." *Id.* (Italics added). The *G.B.* court determined that the No Reasonable Efforts Statute serves the State's compelling interest of protecting children from the abuse and neglect of their parents. *Id.* As to whether the No Reasonable Efforts Statute is narrowly tailored to meet the compelling interest it is intended to serve, the *G.B.* court found that it "is not more intrusive than necessary to protect the welfare of children" because it "include[s] only those parents who have had at least one chance to reunify with a different child through the aid of governmental resources and have failed to do so." *Id.* The *G.B.* court reasoned that "[e]xperience has shown that with certain parents . . . the risk of recidivism is a very real concern. Therefore, when another child of that same parent is adjudged a dependent child, it is not unreasonable to assume that reunification

efforts will be unsuccessful." *Id.* (alterations in original) (quoting *In re Baby Boy H.*, 73 Cal. Rptr. 2d 793, 799 (Cal. Ct. App. 1998)).

[26]     Mother insists that the reasoning of *G.B.* does not apply in this case because, "[a]lthough Mother had her parental rights to two of her children terminated, it is not reasonable to assume that reunification efforts will be unsuccessful with these [C]hildren" because her "history with DCS shows that reunification efforts for her are successful." (Appellant's Br. p. 14). Mother further contends that the No Reasonable Efforts Statute

> does not just include parents who have failed to reunify with a child in the past. In Mother's case, it captures a parent who has had several successful reunifications. These circumstances do not support the justification for the statute allowing no reasonable efforts for reunification. As to Mother, this statute does not serve the state's compelling interest in protecting the [C]hildren because Mother has shown she can successfully reunify with her children.

(Appellant's Br. p. 14). In other words, even though our court has previously held that the No Reasonable Efforts Statute is not unconstitutional on its face, Mother asserts that it should be found unconstitutional as applied to the facts of her case. We find no merit in Mother's argument.

[27]     Between 1999 and 2016, DCS substantiated at least thirteen instances of child abuse or neglect against Mother, which resulted in eleven separate CHINS cases involving all of her children at various points, as well as the termination

of her parental rights to two children. As the trial court aptly found in its Order adjudicating the Children to be CHINS,

> [a]ll of the services which could be offered to [M]other to assist in remedying her behavior and issues have been offered many times before. . . . Mother has not demonstrated an ability to benefit from the services or modify her behavior and do what is in the best interest of her children. Actually, the children continue to suffer harm while under the care, custody and supervision of their Mother.

(Appellant's App. Vol. IV, p. 79). We agree with Mother that she has previously demonstrated an ability to reunify with her children; yet, she testified that all she had to do to comply with her mandatory case plan was to "show up, be on time, don't disrupt the class or get put out of class." (Tr. Vol. III, p. 22). Thus, Mother admittedly did not put any effort into making a meaningful change in her life for the sake of her children, and she did not receive the benefits of the services that DCS *repeatedly* provided to her. By doing the bare minimum, Mother was able to temporarily reunite with her children (with the exception of M.G. and A.G.) following each removal, but her failure to take advantage of multiple opportunities to make permanent changes in her life has resulted in a perpetual cycle of instability for all of her children. The State has a compelling interest in protecting children against such recurring physical and emotional turmoil. As such, we conclude that the No Reasonable Efforts Statute is not unconstitutional as applied to Mother. Moreover, for these same reasons, we also find no merit in Mother's claim that the trial court abused its discretion by granting DCS' request to forego reasonable efforts.

## II. *Void for Vagueness*

[28] Mother also claims that the No Reasonable Efforts Statute is unconstitutionally vague. It is well established that

> [a] *criminal* statute is unconstitutionally vague if the conduct sought to be prohibited is not clearly defined. Such a due process failing may be reflected in one of two distinct statutory flaws: "(1) for failing to provide notice enabling ordinary people to understand the conduct that it prohibits, and (2) for the possibility that it authorizes or encourages arbitrary or discriminatory enforcement."

*Smith v. State*, 8 N.E.3d 668, 676 (Ind. 2014) (emphasis added) (internal citation omitted) (quoting *Brown v. State*, 868 N.E.2d 464, 467 (Ind. 2007)).

> With respect to the first category of vagueness, a statute will not be found unconstitutionally vague if individuals of ordinary intelligence would comprehend it adequately to inform them of the proscribed conduct. As to the second category, a statute is problematic when it "vests virtually complete discretion in the hands of the police to determine whether the suspect has satisfied the statute."

*W.C.B. v. State*, 855 N.E.2d 1057, 1062 (Ind. Ct. App. 2006) (internal citation omitted) (quoting *Kolender v. Lawson*, 461 U.S. 352, 358 (1983)), *trans. denied*. Furthermore, "a statute is void for vagueness only if it is vague as applied to the precise circumstances of the instant case. *Id.*

[29] Here, Mother contends that the No Reasonable Efforts Statute fails the second prong as it authorizes arbitrary enforcement. Specifically, she argues that "DCS has discretion to seek a no reasonable efforts order if the statutory

requirements are met. DCS can arbitrarily choose to seek no efforts or to offer services." (Appellant's Br. p. 15). In turn, the State correctly points out that "case law indicates that the 'void for vagueness' doctrine is 'applicable only to penal statutes, not to non-penal civil statutes.'" (State's Br. p. 24) (citing *Brunton v. Porter Mem'l Hosp. Ambulance Serv.*, 647 N.E.2d 636, 640 (Ind. Ct. App. 1994)). In fact, Mother cites solely to a criminal case in support of her contention that the No Reasonable Efforts Statute is unconstitutionally vague.

[30] Notwithstanding the applicability of the void for vagueness doctrine only to *penal* statutes, we nevertheless agree with the State that the No Reasonable Efforts Statute does not authorize arbitrary enforcement. Rather, certain statutory criteria must be satisfied (*i.e.*, the prior termination of parental rights to the sibling of a current CHINS) before DCS may, in its discretion, determine that it will not allocate the State's resources in order to reunite a parent with her children. Such discretion is not tantamount to arbitrary enforcement. *See, e.g., W.C.B.*, 855 N.E.2d at 1062 (noting that, in a criminal setting, the mere fact that the State may elect not to prosecute certain statutory violators did not render Indiana Code section 35-42-4-3 unconstitutionally vague because decisions to prosecute "may be based on factors other than the satisfaction of statutory elements, but the mere fact that those factors are not laid out in the statute does not render the statute unconstitutionally vague").

## CONCLUSION

Based on the foregoing, we conclude that the No Reasonable Efforts Statute is not unconstitutional as applied to Mother, and the trial court did not abuse its discretion by granting DCS' request to forego reasonable efforts.

Affirmed.

Crone, J. and Altice, J. concur