

FILED

Jul 31 2018, 9:04 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Ana M. Quirk
Muncie, Indiana

ATTORNEYS FOR APPELLEE
THE INDIANA DEPARTMENT OF
CHILD SERVICES

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

ATTORNEY FOR APPELLEE
DELAWARE COUNTY, INDIANA
CASA

Jon L. Orlosky
Muncie, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Involuntary Termination of the Parent-Child Relationship of Z.B., D.B., L.B., Me.B., Ma.B. (Minor Children)

and

A.B. (Mother),

*Appellant-Respondent,*

v.

July 31, 2018

Court of Appeals Case No.
18A-JT-318

Appeal from the Delaware Circuit Court

The Honorable Kimberly S. Dowling, Judge

The Honorable Amanda L. Yonally, Magistrate

| The Indiana Department of Child Services, | Trial Court Cause Nos. 18C02-1609-JT-37 |
| --- | --- |
| *Appellee-Petitioner,* | 18C02-1609-JT-38 |
| | 18C02-1609-JT-39 |
| and | 18C02-1609-JT-40 |
| | 18C02-1611-JT-53 |
| Delaware County, Indiana CASA, | |
| *Appellee-Petitioner.* | |

**Bailey, Judge.**

## Case Summary

A.B. ("Mother") challenges the juvenile court's decision to terminate her parental rights as to her five children who had previously been adjudicated Children in Need of Services ("CHINS"): Z.B., D.B., L.B., Me.B., (the "Siblings") and Ma.B (collectively, the "Children").[1] Notably, the Delaware County Department of Child Services ("DCS") opposed terminating Mother's parental rights with respect to Ma.B., but Ma.B's court-appointed special

---

[1] The order also terminated the parental rights of S.B., who was the father of the Siblings; S.B. testified in favor of adoption, and does not actively participate in this appeal. Moreover, we note that there was no petition to terminate the parental rights of Ma.B.'s father, C.B.; he participated in the proceedings as an interested party, but also does not actively participate in this appeal.

advocates (the "CASAs") pursued termination through counsel. Mother now presents the following consolidated and restated issues:

> I.      Whether a CASA has the statutory authority to prosecute a petition to terminate parental rights when DCS opposes termination; and
>
> II.     Whether there is sufficient evidence supporting the termination of Mother's parental rights.

We affirm, but remand for correction of certain scrivener's errors.

# Facts and Procedural History

At some point, DCS alleged that the Children were CHINS, and, in May of 2015, Diana Robertson and Mary Fitzgerald became the Children's CASAs. In June of 2015, Ma.B. was adjudicated a CHINS, and Mother admitted certain CHINS allegations as to the Siblings, including:

> a.      On or about April 10, 2015, [Mother] entered into an Informal Adjustment with [DCS] due to educational neglect, substance abuse, home conditions, and lack of supervision.
>
> b.      [Mother] was positive on April 16, 2015 for methamphetamines and uses other illicit substances such as, but not limited to, heroin, methamphetamines and prescription narcotics.

c.  Home conditions barely meet minimal standards and [M]other is struggling to maintain appropriate living conditions.

d.  Mother struggles to control [Z.B.'s] behaviors as he is destructive, violent and injures the other children.

Ex. Vol. I at 26, 167; Ex. Vol. II at 58, 201.

[4]  The Siblings were at one point placed with family. As to Ma.B., Mother consented to a modification of custody so that C.B. ("Father") became Ma.B.'s custodian, and Ma.B. began living with Father and his wife ("Stepmother").

[5]  On September 30, 2016, DCS filed a petition to terminate Mother's parental rights as to the Siblings. On November 21, 2016, the CASAs filed a petition to terminate Mother's parental rights as to Ma.B. DCS and Mother then moved to dismiss the petition concerning Ma.B., arguing—among other things—that the CASAs could not prosecute a petition to terminate parental rights where DCS did not support the petition.[2] The court denied the motions to dismiss and consolidated the proceedings concerning the Children. The court then held a fact-finding hearing on June 15, August 23, and October 18, 2017. The court took the matter under advisement, and later entered an order terminating Mother's parental rights to the Children.

---

[2] DCS did not support the petition because Ma.B. was already placed with a parent. DCS and Mother asserted that Ma.B. was safe with Father as her physical custodian and that "[s]evering the parental rights of the mother is extreme and unnecessary where the child can be protected by a parent." App. Vol. II at 55, 66.

Mother now appeals.

# Discussion and Decision

## Statutory Authority

Mother and DCS present what appears to be an issue of first impression: whether a CASA has the statutory authority to prosecute a petition to terminate parental rights when DCS opposes termination. We interpret statutes *de novo*. *In re Bi.B.*, 69 N.E.3d 464, 466 (Ind. 2017).

> [B]efore interpreting a statute, we consider "whether the Legislature has spoken clearly and unambiguously on the point in question." *Basileh v. Alghusain*, 912 N.E.2d 814, 821 (Ind. 2009). If a statute is clear and unambiguous, we put aside various canons of statutory construction and simply "require that words and phrases be taken in their plain, ordinary, and usual sense." *Id.* Indeed, "[c]lear and unambiguous statutes leave no room for judicial construction." *Id.* We will find a statute ambiguous and open to judicial construction only if it is subject to more than one reasonable interpretation.

*KS&E Sports v. Runnels*, 72 N.E.3d 892, 898-99 (Ind. 2017).

When a child is alleged to be a CHINS under certain statutory sections, the court must "appoint a guardian ad litem, court appointed special advocate, or both, for the child." Ind. Code § 31-34-10-3. The court is also obligated to do so if a parent opposes a petition to terminate parental rights. I.C. § 31-35-2-7(a). In the termination context, the CASA's role is "to represent and protect the best interests of the child in the termination proceedings." I.C. § 31-35-2-7(b).

[9] It is clear that a CASA may sign and file a petition to terminate parental rights when a child has been adjudicated a CHINS. Indeed, Indiana Code Section 31-35-2-4(a) provides as follows:

> A petition to terminate the parent-child relationship involving a . . . child in need of services may be signed and filed . . . by any of the following:
>
> (1) The attorney for the department.
>
> (2) The child's court appointed special advocate.
>
> (3) The child's guardian ad litem.

Moreover, it is equally clear that DCS represents the State's interests in termination proceedings: "Upon the filing of a petition under section 4 of this chapter, the attorney for the department shall represent the interests of the state in all subsequent proceedings on the petition." I.C. § 31-35-2-5.

[10] Mother and DCS read these statutes as prohibiting proceedings on a petition to terminate parental rights whenever DCS opposes the petition. They argue that DCS should not be burdened with involvement in termination proceedings that the State does not support. DCS further argues that letting a "CASA prosecute a termination petition is tantamount to letting a child prosecute a termination case against his or her parents." DCS Br. at 29. DCS also directs us to caselaw in the adoption context where we have strictly construed statutes to preserve the parent-child relationship in light of the fundamental importance of the parent-

child relationship. *See In re K.F.*, 935 N.E.2d 282, 289 (Ind. Ct. App. 2010), *trans. denied*.[3] The CASAs respond that because the legislature specifically authorized them to independently initiate termination proceedings, it follows that they can also independently prosecute these matters.

[11]  We agree with the CASAs. An authorization to file a petition cannot be reasonably read to prohibit prosecuting that petition, and this plain reading in no way affects the elements or burden of proof for termination. Moreover, our legislature specifically created a mechanism for DCS—or a guardian ad litem or a CASA—to express opposition to a petition to terminate parental rights. That is, any "person described in section 4(a)" may—as DCS did here—file a motion to dismiss the petition, asserting "a compelling reason, based on facts and circumstances stated in the petition or motion, for concluding that filing, or proceeding to a final determination of, a petition to terminate the parent-child relationship is not in the best interests of the child." I.C. § 31-35-2-4.5(d)(1). That motion may be successful, but when it is not, we discern no impediment to proceeding with the petition to terminate parental rights. Thus, there was no error based upon DCS's opposition to the petition concerning Ma.B.

---

[3] To the extent that DCS relies upon *In re S.G.*, 67 N.E.3d 1138 (Ind. Ct. App. 2017), that case involved a due process challenge to the constitutionality of a statute—and there is no constitutional challenge here.

# Sufficiency of the Evidence

[12] "A parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005) (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). Indeed, "the parent-child relationship is one of the most valued relationships in our culture." *Id*. at 147 (quotation marks removed). "Our General Assembly has thus set a high bar for terminating parental rights." *In re Bi.B.*, 69 N.E.3d at 465.

[13] Under Indiana Code Section 31-35-2-4(b)(2), a petition seeking to terminate the parent-child relationship must allege, in pertinent part:

> (A) that one (1) of the following is true:
>
>> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree. . . .
>
> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child. . . .
>
> (C) that termination is in the best interests of the child; and

> (D) that there is a satisfactory plan for the care and treatment of the child.

The petitioner must prove each element by clear and convincing evidence. I.C. § 31-37-14-2. If the court finds that the allegations are true, "the court shall terminate the parent-child relationship." I.C. § 31-35-2-8(a). In doing so, the court must enter findings and conclusions, irrespective of whether the parties have made a Trial Rule 52 request. *See* I.C. § 31-35-2-8(c); Ind. Trial Rule 52. We will not "set aside the findings or judgment unless clearly erroneous," T.R. 52(A); clear error is "that which leaves us with a definite and firm conviction that a mistake has been made," *Egly v. Blackford Cty. Dept. of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992). In reviewing for clear error, we look to "whether the evidence supports the findings, and whether the findings support the judgment." *Steele-Giri v. Steele*, 51 N.E.3d 119, 123 (Ind. 2016). Moreover, we neither reweigh the evidence nor judge the credibility of witnesses, *In re R.S.*, 56 N.E.3d 625, 628 (Ind. 2016), and we give "due regard . . . to the opportunity of the trial court to judge the credibility of the witnesses," T.R. 52(A).

[14] Here, the juvenile court found that although Mother's substance abuse was an initial concern, substance abuse "was no longer a primary concern of DCS" by the time of the fact-finding hearing. App. Vol. II at 173.[4] Indeed, much of that hearing—and the ensuing findings and conclusions—focused on issues related

---

[4] For each child, the court entered separate findings and conclusions. Where these findings and conclusions are identical, we cite only to the order concerning Z.B.

to Mother's ability to supervise the Children to ensure their safety.[5]  We note that at the time of the fact-finding hearing, Ma.B. was eleven years old and the Siblings were between three years old and ten years old.

[15]  The court found that Mother began working with a therapist in the summer of 2015.  The initial focus for therapy "was substance abuse based on the referral" from DCS, but that focus "quickly transitioned to mother's mental health and cognitive concerns based on the therapist's experience and observations."  *Id.* at 175.  Mother's therapist recommended a psychological evaluation, which revealed that Mother has cognitive disabilities that impact "her day-to-day living, including increased difficulty with problem-solving, lack of [judgment], difficulty interacting with peers in her environment, and difficulty with problem-solving on behalf of children."  *Id.* at 176.  The evaluation "revealed a full-scale I.Q. of 64" for Mother, and Mother received "a provisional diagnosis of a neurocognitive disorder due to a traumatic brain injury."  *Id.*  In view of Mother's "extremely low cognitive functioning, low academic functioning, and issues with memory and clear thinking," the psychologist recommended that Mother "receive supportive services to assist in her day-to-day tasks," and receive parenting education "based on indications of [Mother's] lack of empathy toward children and expectations of children."  *Id.*

---

[5] There were other identified issues, such as Mother's struggles with maintaining a stable residence. However, as we need only identify sufficient evidence to support the court's decision, we elect not to discuss every issue identified in the findings or addressed in the parties' briefs.

[16] Mother agreed to have a service provider act as payee for her disability benefits so she could receive assistance "with finding stable housing and managing her money." *Id.* at 174. With that support in place, Mother also began working with a child and family therapist who started therapeutically supervising Mother's visits in July of 2016; prior to that point, the visits were supervised but without therapeutic elements. The therapist was aware of the results of the psychological evaluation and "relied on those results in her therapeutic approach" with Mother. *Id.* at 176. During those therapeutically supervised visits, the therapist "observed significant conflict, arguing, [and] physical aggression" among the Children, and that Mother displayed a "lack of supervision." *Id.* at 177. Mother "was unable to focus on more than one child" and "failed to notice and intervene during physical aggression and fights." *Id.*

[17] In November 2016, a second therapist began helping to supervise visits, as the first therapist believed she "could not effectively work with [Mother] while at the same time keeping track of the children and ensuring their safety." *Id.* The court found that adding a therapist "was necessary both to ensure the safety" of the Children and "to effectively address parenting issues" with Mother. *Id.* Around this time—in October 2016—Ma.B.'s visitation with Mother was suspended. Ma.B. had exhibited instances of self-harm prior to October 2016, and failed to make any improvement in therapy sessions between February 2016 and October 2016. After suspending visitation, Ma.B. made "significant improvement, including being happier and more optimistic, reducing negative behavior, and progressing academically" to the point where she no longer

requires an individualized education program at school. *Id.* at 100. There were also no instances of self-harm after suspending visitation.

[18] Over the course of Mother's therapeutically supervised visits, Mother made progress in some areas, including her ability to provide time-outs, but she "did not make progress in her ability to monitor and supervise." *Id.* Mother often "lost track" of the Children and was unaware of their whereabouts. *Id.* Although Mother asked what she could do to improve, and a therapist responsively set up extra meetings to help with Mother's parenting, Mother "did not attend th[ose] appointments." *Id.* Moreover, at some point, Mother moved to Anderson, and her family case manager made efforts to transfer Mother's services there; when Mother subsequently moved back to Muncie, she "informed the service providers that she did not need their assistance and involvement." *Id.* at 178. Mother also registered for certain parenting classes in March of 2017 "but failed to attend any of the classes." *Id.* at 174.

[19] We note that mental or cognitive disabilities, standing alone, are not a proper basis for termination of parental rights. *See In re V.A.*, 51 N.E.3d 1140, 1147 (Ind. 2016). However, a court may consider these issues where "parents are incapable of or unwilling to fulfill their legal obligations in caring for their children." *Egly*, 592 N.E.2d at 1234. This is because "the purpose of terminating parental rights is not to punish parents, but to protect the children." *Id.* (citing *Lassiter v. Dept. of Social Services*, 452 U.S. 18 (1981)).

[20]     The court ultimately found that Mother "is not capable of safely or effectively parenting" the Children, *id.* at 178, and the evidence favorable to the court's decision supports this finding.  Moreover, this parenting issue—encompassing a lack of supervision and a struggle to control violent behaviors—was among the admitted CHINS allegations, and was an ongoing issue that led to continued placement outside Mother's home.  We note also that there was no indication that Mother's cognitive functioning would improve; rather, Mother's therapist opined that Mother should continue to have a payee and, for the rest of her life, Mother would likely struggle with managing aspects of day-to-day life.

[21]     Under statutory subsection (b)(2)(B), the juvenile court determined that there was a reasonable probability both that the continuation of the parent-child relationship posed a threat to the well-being of the Children and that the reasons for placement outside the home would not be remedied.  The court also made the requisite determinations with respect to the other subsections, observing that the plan was for Ma.B. to remain in Father's care and also be adopted by Stepmother, and that the plan for the Siblings was to be adopted.

[22]     Mother does not dispute whether the Children were out of her care for the statutory period or whether there was a satisfactory plan for the care and treatment of the Children.  Instead, Mother appears to focus on the other elements, specifically asserting that the evidence does not indicate that the Children's "survival was threatened or that termination was in their best interests."  Appellant's Br. at 32.  With respect to Ma.B., Mother focuses on whether the "conditions that caused the removal . . . have been remedied with

the change of placement and custody to [Father]." Appellant's Br. at 29. DCS also argues that the evidence was insufficient with respect to Ma.B.[6]

[23] In her brief, Mother directs us to evidence indicating that she participated in a variety of services, and made progress during the more than two years that the Children were placed outside her home. However, we may not reweigh the evidence, which supports a conclusion that there is a reasonable probability that continuation of the parent-child relationship poses a threat to the well-being of the Children. *See* 31-35-2-4(b)(2)(B)(ii). Indeed, the lack of supervision and the attendant prospect of uncontrolled violence poses a threat to their safety.

[24] Mother and DCS argue that there was no threat to at least Ma.B. because Father had physical custody. To the extent Mother and DCS are arguing that termination of one parent's rights is inappropriate when a child can live with the other parent, it is true that termination is intended as a last resort, available only when all other reasonable efforts have failed. *In re V.A.*, 51 N.E.3d at 1151-52. However, our legislature has not articulated different termination standards for children placed with a parent and for children placed in foster care—and the evidence indicates that Mother remained unable to safely care for Ma.B., even after participating in extensive services aimed toward reunification.

---

[6] In one way or another, much of DCS's argument focuses on the plan for stepparent adoption. At one point, DCS argues that "the court's satisfactory plan conclusion is . . . clearly erroneous" because the plan did not require terminating Mother's parental rights through a termination proceeding. DCS Br. at 26. DCS argues thusly: "[w]hile it may be a satisfactory plan if rights are terminated, it is also a proper and statutor[ily] valid permanency plan that does not require the termination of Mother's parental rights to achieve it." *Id.* DCS has not persuaded us that the court clearly erred in determining that there was a satisfactory plan.

This inability persisted whether or not DCS's ultimate plan was for Ma.B. to remain in Father's custody and be adopted by Stepmother. Moreover, the court found that it would be very traumatic for Ma.B. to return to Mother's care. Finally, we are not persuaded by Mother's assertion that, in light of the custody arrangement with Father, the potential for harm to Ma.B. was too speculative to support terminating parental rights.[7]

[25] As to the best interests of the Children, in determining whether termination of parental rights is in the best interests of a child, the court is required to look at the totality of the evidence. *In re D.D.*, 804 N.E.2d 258, 267 (Ind. Ct. App. 2004), *trans. denied*. In doing so, the court must subordinate the interests of the parents to those of the children involved. *Id.* The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). Moreover, the testimony of service providers may support a finding that termination is in the child's best interests. *Id.*

[26] Here, the evidence favorable to the court's decision indicates that the Children would not be safe in Mother's care. Moreover, Diana Robertson—the CASA called to testify at the fact-hearing—testified that terminating Mother's parental

---

[7] As we have concluded that there is sufficient evidence supporting at least one of the elements under subsection (b)(2)(B), we do not address arguments related to whether Ma.B.'s custodial arrangement with Father adequately remedied the conditions that led to her removal from Mother's home.

rights would serve the best interests of the Children.[8] In rendering her opinion, the CASA expressed particular concern about Ma.B.—and Ma.B.'s therapist also opined that termination was in Ma.B.'s best interests. Thus, we conclude that there is sufficient evidence concerning the best interests of the Children.[9]

[27] There is clear and convincing evidence supporting the court's decision to terminate Mother's parental rights as to the Children, and we therefore affirm the decision of the juvenile court. However, we observe—and DCS has pointed out—that the court made scrivener's errors in entering orders pertaining to D.B., L.B., and Me.B. That is, although each order contains a caption for the cause specific to each child, and each order identifies the captioned child in its findings, the concluding language refers to Z.B. when ultimately ordering the termination of parental rights. We remand for correction of these three orders.

# Conclusion

[28] Because a CASA has the statutory authority to independently prosecute a petition to terminate parental rights, it was not improper for the CASAs to

---

[8] Mother briefly suggests that the filing of the petition as to Ma.B. "appears to be vindictive" because the relationship between Diana Robertson and Mother had deteriorated in the wake of an allegation that Ms. Robertson battered Z.B. Appellant's Br. at 29. Mother also directs our attention to the number of CASA-related individuals that attended the hearing. Nonetheless, we reiterate that we cannot reweigh the evidence.

[9] DCS argues that termination was not in Ma.B.'s best interests in part because the plan was for Stepmother to adopt Ma.B., and termination would affect Ma.B.'s "ability to benefit from Mother's social security disability payments as well as to inherit from Mother." Appellee's Br. at 26. We note, however, that for a biological parent not married to the adoptive stepparent, the effect of adoption is to relieve the biological parent "of all legal duties" and divest the parent "of all rights with respect to the child"—and the act of adoption also affects intestate succession. *See* I.C. §§ 31-19-15-1, -2; I.C. § 29-1-2-8.

prosecute the petition concerning Ma.B. while DCS opposed termination. Moreover, there was sufficient evidence supporting the termination of Mother's parental rights as to the Children. However, we are remanding for correction of scrivener's errors in the orders pertaining to D.B., L.B., and Me.B.

[29] Affirmed and remanded.

Crone, J., and Brown, J., concur.