

**FILED**

Jan 23 2020, 9:10 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jennie Scott
Muncie, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Marjorie Lawyer-Smith
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of B.F. and C.F. (Minor Children), | January 23, 2020 |
| | Court of Appeals Case No. 19A-JT-1857 |
| C.B. (Mother), | Appeal from the Delaware Circuit Court |
| *Appellant-Respondent,* | |
| v. | The Honorable Kimberly S. Dowling, Judge |
| Indiana Department of Child Services, | Trial Court Cause Nos. 18C02-1810-JT-118, -119 |
| *Appellee-Petitioner* | |

**Baker, Judge.**

[1] C.B. (Mother) appeals the trial court's order terminating her parent-child relationship with her children, B.F. and C.F. (the Children). Mother argues that there is insufficient evidence supporting the order.

[2] The only lingering issue for Mother is a lack of stable and suitable housing. She and the Children are bonded and her parenting skills are appropriate. Moreover, the trial court denied the petition to terminate the parental rights of the Children's father, meaning that terminating Mother's rights will not achieve permanency for the Children. Under these circumstances, we find that termination is not in the Children's best interests. Therefore, we reverse and remand.

## Facts

[3] B.F. was born in December 2012 and C.F. was born in May 2014 to Mother and R.F. (Father).[1] Mother also has four older children who are cared for by Mother's parents under a guardianship.

[4] In June 2015, Mother and the Children were living in Muncie. On June 14, 2015, the Department of Child Services (DCS) filed a petition alleging that the Children were Children in Need of Services (CHINS). DCS also removed the Children from Mother's care and custody, placing them in relative care. The

---

[1] Father and Mother were not in a relationship (nor did they appear to be engaged in co-parenting) during the relevant period of time. As the trial court denied the petition to terminate Father's relationship with the Children, he is not a party to this appeal.

Children were later moved into kinship care with Ashley Geheb, a close family friend who lives in Lafayette.

[5] Mother ultimately admitted that she left the Children unattended on June 12, 2015, that she was transported to the hospital for a drug overdose, and that she was subsequently arrested and charged with possession of a controlled substance and neglect of a dependent. On August 10, 2015, the trial court found the Children to be CHINS based on these admissions.

[6] At a later dispositional hearing, Mother was ordered to complete parenting, substance abuse, and psychological assessments and comply with any recommendations, submit to random drug screens, obtain stable housing, and participate in supervised visitation with the Children. At some point during 2015, Mother moved to Lafayette, which was where the Children were placed. DCS considered transferring the case from Delaware to Tippecanoe County, but ultimately decided against it.

[7] Throughout the end of 2015 and the first half of 2016, Mother had sporadic participation and contact with DCS. But in June 2016, she re-engaged in services and communicated more regularly with DCS. She began to make progress, albeit slowly. Sometime in October 2016, Mother gave birth to a

baby.[2] DCS did not file a CHINS petition with respect to that baby, who remained in her care and custody.

[8] By the beginning of 2017, Mother was involved with home-based case management, home-based therapy, individual therapy, and supervised visitation. She had also secured housing with the help of DCS and her service providers. By December 2017, Mother had secured a bigger apartment and had stable employment with Purdue University (through a temporary employment agency). She had consistently provided clean drug screens, DCS was no longer concerned about substance abuse, and visits with the Children were going well.

[9] DCS and Mother's service providers continued to be concerned about her ability to maintain stable housing. Because she has a prior felony conviction, she does not qualify for Section 8 housing with the Department of Housing and Urban Development. Additionally, Mother struggled to maintain a sufficient income, which was a barrier to achieving stable housing. One of Mother's Family Case Managers (FCM)[3] explained that another part of the problem was that Mother "was not always very—real great at following through. . . . Uh, as long as somebody was there and willing to come in with her and work with her and walk her through the process, she did a good job of—of getting things done.

---

[2] That baby has a different father. There was domestic violence between Mother and the baby's father, but once their relationship ended and Mother continued to participate with services, DCS had no lingering concerns about domestic violence.

[3] She had four different FCMs over the course of the case.

Um, but if you just gave her a directive to do it on her own and get it done, um, it was pretty hit and miss as to whether she would follow through or not." Tr. Vol. II p. 206.

[10] Also acting as a barrier to achieving stable housing and income was the fact that Mother has a seizure disorder, which renders her unable to apply for the many factory jobs available in Lafayette. Additionally, it prevents her from being able to drive and leaves her reliant on public transportation.

[11] Notwithstanding these lingering concerns, the Children were placed on a trial home visit with Mother and the baby in February 2018. DCS and Mother's service providers helped her obtain vouchers[4] for childcare so that she could continue to go to work at Purdue, but they were unable to find one center with room for all three children. The Children went to one center and the baby went to another, which was across town. As a result of this situation, it took Mother *six hours* every day to get her kids to and from daycare. They got on the bus each morning at 6:00 a.m. and rode to the Children's daycare. After dropping them off, Mother and the baby then got back on the bus and rode to the other daycare. Then, Mother had to take the bus to Purdue. The whole journey took close to three hours. It also cut into her work hours, forcing her to become a

---

[4] To obtain vouchers, Mother had to first be employed—which is a challenge to begin with, given that lack of childcare would hinder the job-seeking process. Moreover, the daycare centers often have long waiting lists, meaning that "even if she were to get a job, she may not be able to work at that job" because of the lack of childcare. Tr. Vol. II p. 88. Her home-based case manager acknowledged that this system is a "vicious circle." *Id.*

part-time, instead of a full-time, employee. Mother explained that she "went from working from nine to five p.m. to ten to two p.m." Tr. Vol. III p. 3.

[12] At some point, Mother stopped working for Purdue. She explained that when Purdue recessed for the summer, the work that she provided was not necessary; therefore, she did not have employment at the university until the students returned in the fall. When her work stopped at Purdue, she stopped taking the Children to daycare. But when using vouchers, if a parent stops taking her children to daycare for two weeks or more, she loses those spots. Therefore, at that point, Mother no longer had childcare in place.

[13] Mother's service providers worked to help her find steady employment. They helped her create a resume, gave her a list of resources to use to find open jobs, and even drove her to interviews with the Children in the vehicle after Mother had lost the daycare spots. Mother got discouraged, reporting that nothing ever "seemed to pan out," given her health and legal limitations as well as the fact that she did not have a high school diploma or GED. Tr. Vol. II p. 67. She began to feel "like people were just waiting for her to fail." *Id.* at 89. Service providers got frustrated because "there was always an excuse as to why she couldn't get out . . . and look for jobs or interview for jobs. . . . There was just always a lot of help needed in whatever she needed to have done." *Id.* at 71. Mother "was working pretty diligently" and cooperating with her service providers, but was simply unable to find steady employment. *Id.* at 74.

[14]  Mother and the Children were living in an apartment provided by Seeds of Hope. At some point after Mother's employment with Purdue ended, Seeds of Hope offered to let her clean the apartments in the complex in exchange for her rent, and even found another tenant to provide childcare while Mother was working. That arrangement worked for a while, but over time, the quality and consistency of Mother's work lessened to a point that Seeds of Hope was no longer satisfied with the arrangement. At that point, Mother and the Children were going to be evicted. Consequently, on June 16, 2018, DCS again removed the Children from her care and custody and placed them back with Geheb.[5] [6] Shortly after that, the Children's permanency plan was changed from reunification to adoption.

[15]  After the Children were removed from Mother's care and custody, she continued to visit with them consistently. All service providers who have observed Mother's interactions with the Children have noted that they have an obvious bond and that Mother parents them in a caring and appropriate way. At the time of the termination hearing, Mother was not participating with services in this CHINS case, but she was doing so consistently in the Tippecanoe County CHINS case.

---

[5] DCS also filed a petition alleging that the baby was a CHINS. That is a separate case from this appeal and is ongoing in Tippecanoe, rather than Delaware, County.

[6] In July 2018, Mother's employment at Purdue resumed, but as she noted, the Children "were already out of my care." Tr. Vol. III p. 6.

[16] On October 31, 2018, DCS filed a petition to terminate the parent-child relationship between Mother, Father, and the Children. On February 14, 2019, DCS filed a motion to dismiss its termination petition given the progress that Father had made towards being an appropriate parent to the Children. The trial court denied the motion to dismiss, finding that DCS's reasoning was not compelling because the Children had been removed from their parents for "nearly four years." Appellant's App. Vol. II p. 25.

[17] The termination hearing took place over four days in April 2019. At that hearing, Mother reported that she had a full-time job at Wendy's and had been working there for approximately nine months.[7] She was living with her pastor, who would not allow the Children to live there as well. Mother conceded that at that time, she was not ready for the Children to be placed with her, given her lack of suitable housing, but she does not believe that adoption is in the Children's best interests because "I still wanna be—I mean, they're my children at the end of the day." Tr. Vol. III p. 18. Mother reported that she is continuing to work very hard to achieve the stability needed to have the Children placed safely back in her care and custody.

[18] On July 15, 2019, the trial court denied the termination petition as to Father but granted it as to Mother. In pertinent part, it found as follows:

---

[7] Mother left her job with Purdue because her job hours there would not have permitted her to visit with the Children. She reported that she got the job at Wendy's "right away" after she left Purdue. Tr. Vol. III p. 11.

118.    There is a reasonable probability that the conditions that resulted in the [Children's] removal or the reasons for placement outside of the home of Mother will not be remedied. Throughout the duration of the [Children's] CHINS case, Mother either failed to participate in or benefit from services ordered to assist her. DCS has presented clear and convincing evidence upon which the Court can reasonably conclude that Mother has not remedied the conditions that resulted in the [Children's] removal from her care and continued placement outside of her home.

119.    Throughout the duration of the [Children's] CHINS case, Mother had multiple opportunities for assistance with housing and employment and benefitted greatly from community support and resources in Tippecanoe County. She has, in fact, obtained housing and employment on more than one occasion. However, Mother has established through a pattern of conduct over the past 46 months that she is unable or unwilling to maintain her employment or to maintain suitable housing for her children. Notably, Mother testified at the Fact-Finding Hearing that she is not currently stable and could not care for her children if they were returned to her care.

120.    Despite having numerous services and resources to assist her, Mother is of the opinion that she did not receive enough help from others. Mother does not accept responsibility for her own actions and inactions leading to the repeated loss of her housing and employment, and her lack of accountability at the time of the Fact-Finding Hearing weighs against her ability or willingness to make the necessary changes to provide a safe and stable environment for her child[ren].

121. The [Children] need[] a safe, stable, secure and permanent environment in order to thrive. Mother has not shown the inclination or the ability to provide the [Children] with such an environment and has not demonstrated that she is able to provide a home free of abuse or neglect for the [Children]. Mother's habitual patterns of conduct support the substantial probability of future neglect or deprivation of the [Children].

122. Termination of the parent/child relationship between Mother and the [Children] is in the best interest of the [Children].

123. [DCS] has a satisfactory plan for the care and treatment of the [Children], which includes adoption. An alternative satisfactory plan for the care and treatment of the [Children] includes reunification with Father.

\*\*\*

134. Father's conditions have changed since the outset of the CHINS case. Father now has stable housing and has shown that he is financially capable of supporting the [Children]. Father has established and maintained a relationship with the [Children]. Father is visiting consistently with the [Children] and wishes to obtain custody of the [Children]. Father is willing and able to provide for the [Children's] needs.

\*\*\*

137. The [Children have] been in [their] current placement with Ashley Geheb for the majority of the time spent out of [their] parents' care. [They are] strongly bonded to [their]

placement and know[] it as [their] home.  The [Children's] need for permanency is a factor in determining whether termination is in the [Children's] best interest.  However, a child's need for immediate permanency is not reason enough to terminate parental rights where the parent has an established relationship with his child and has taken positive steps toward reunification.

138. Termination of Father's parental rights here does not serve the best interest of the [Children].  Father and [the Children] share a bond and the [Children] know[] Father as [their] "dad."  Ms. Geheb has provided the [Children] with a caring, stable home for an extended length of time, and the Court does not minimize the loving relationship that she has with the [Children].  However, a parent's constitutional right to raise his own child may not be terminated solely because there may be a better home available for the child.

Appealed Order p. 9-12 (internal citations omitted).  Mother now appeals.

# Discussion and Decision

# I.  Standard of Review

[19]  Our standard of review with respect to termination of parental rights proceedings is well established.  In considering whether termination was appropriate, we neither reweigh the evidence nor assess witness credibility. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1229 (Ind. 2013).  We will consider only the evidence and reasonable inferences that may be drawn therefrom in support of the judgment, giving due regard to the trial court's opportunity to judge witness credibility firsthand.  *Id.*  Where, as here, the trial

court entered findings of fact and conclusions of law, we will not set aside the findings or judgment unless clearly erroneous. *Id.* In making that determination, we must consider whether the evidence clearly and convincingly supports the findings, and the findings clearly and convincingly support the judgment. *Id.* at 1229-30. It is "sufficient to show by clear and convincing evidence that the child's emotional and physical development are threatened by the respondent parent's custody." *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 148 (Ind. 2005) (internal quotations omitted).

[20] Indiana Code section 31-35-2-4(b)(2) requires that a petition to terminate parental rights for a CHINS must make the following allegations:

> (A)    that one (1) of the following is true:
>
>> (i)    The child has been removed from the parent for at least six (6) months under a dispositional decree.
>>
>> (ii)   A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.
>>
>> (iii)  The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

    (i)    There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

    (ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

    (iii)    The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

DCS must prove the alleged circumstances by clear and convincing evidence. *K.T.K.*, 989 N.E.2d at 1230.

## II. Best Interests

[21] In this case, we choose to turn first to DCS's obligation to prove, by clear and convincing evidence, that termination of the parent-child relationship is in the Children's best interests. To determine what is in the best interests of the Children, we must examine the totality of the circumstances. *In re A.W.*, 62 N.E.3d 1267, 1275 (Ind. Ct. App. 2016).

[22] Mother has undeniably struggled over the years. She has battled issues of substance abuse, domestic violence, and mental health, and has progressed so much on these issues that they are no longer a concern. She is bonded to the Children and, while not always perfect (though we wonder which parents are?), she has generally showed appropriate and loving parenting skills.

[23] Therefore, at the time of the termination hearing, the only lingering issue was Mother's inability to find stable housing. It is evident that she has been given many resources and a great deal of help with these issues, but by the time of the termination hearing, while Mother had stable, full-time employment,[8] she had not yet secured stable housing for herself and the Children. We must acknowledge that her patterns of conduct over the years could lead to a reasonable conclusion that she is not likely to achieve and maintain success in these areas.

[24] We must also acknowledge, however, the many barriers that have been, and continue to be, in the middle of her path to success. Her seizure disorder renders her unqualified for many of the most stable factory jobs. It also prevents her from driving, meaning that she is wholly reliant on public transportation. The childcare arrangements that DCS helped her find required six hours of travel each day, meaning that Mother had to decrease her hours to

---

[8] The trial court noted that Mother had not provided proof of her employment at Wendy's to DCS, though the FCM admitted that she had not requested that verification. Tr. Vol. II p. 134. Furthermore, no one at the hearing questioned whether she had, in fact, acquired and maintained that job.

a point that she was only a part-time employee. She does not have a high school diploma or G.E.D. She has a prior felony conviction, which makes finding housing very challenging.

[25] It may be that in a vacuum, the evidence in the record related to Mother's history of housing and employment, as well as her reluctance or unwillingness to fully take advantage of the services in place would support a termination order. But here, the time she spends with her children is appropriate and there is no reason that visitation could not continue.[9] Normally, we would focus on the length of time a CHINS case has been open—here, a relatively lengthy four years—and conclude that the Children deserve permanency. In this case, however, terminating Mother's parental rights does not achieve permanency for the Children because the trial court denied the petition to terminate Father's parental rights. In other words, even after the termination of Mother's rights, the Children remained in kinship care, with a possibility that they will reunify with Father.

[26] The involuntary termination of parental rights is "the most extreme measure that a court can impose and is designated only as a last resort when all other reasonable efforts have failed." *In re N.Q.*, 996 N.E.2d 385, 391 (Ind. Ct. App.

---

[9] We acknowledge the caselaw providing that it is not per se erroneous to terminate the rights of one parent but not the other. *Z.B. v. Ind. Dep't of Child Servs.*, 108 N.E.3d 895, 903 (Ind. Ct. App. 2018), *trans. denied*. In cases where the child's well-being suffers when visiting with the parent whose rights were terminated (because of, for example, substance abuse or serious mental health issues), we can see why this course of action might possibly be appropriate. But in the case before us, the Children are bonded to Mother, her parenting is appropriate, and there are no safety concerns related to the time they spend together.

2013). In this case, DCS explicitly concedes that "[t]here are other ways the court could have potentially structured or set out the plan of care for Child[ren] given that it did not terminate Father's rights" and that "there may be less restrictive means than termination . . . ." Appellee's Br. p. 29. If there are "other ways" the Children's well-being can be assured and "less restrictive means" of achieving that than terminating their relationship with their mother, then the judicial system is obligated to explore those options before arriving at the last resort of termination.

[27] Even though Mother was not in a place at the time of the termination hearing where she was able to be a safe and appropriate caregiver for the Children, we simply cannot conclude that termination is in their best interests so long as reunification with Father is an option. There is no reason whatsoever that Mother cannot continue to spend time with her Children while they are in kinship care or, if they are reunified with Father, once they are in his care. Obviously, if the situation reaches a point where reunification with Father is no longer an option and permanency for the Children can be achieved, the analysis would change. But at this point, it is not in their best interests to impose the most extreme measure possible when there are less restrictive options available. Therefore, we find that the trial court's order granting the termination petition was erroneous.

[28] The judgment of the trial court is reversed and remanded.

Riley, J., and Brown, J., concur.