## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 08 2019, 9:14 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT:
A.E. (MOTHER)

Justin R. Wall
Huntington, Indiana

ATTORNEY FOR APPELLANT:
D.M. (FATHER)

Yvonne M. Spillers
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE:
INDIANA DEPARTMENT OF
CHILD SERVICES

Curtis T. Hill, Jr.
Attorney General of Indiana

Frances Barrow
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Involuntary Termination of the Parent-Child Relationship of: E.M. (Minor Child),

and

A.E. (Mother), and D.M. (Father)

*Appellants-Respondents,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

October 8, 2019

Court of Appeals Case No. 19A-JT-937

Appeal from the Wells Circuit Court

The Honorable Kenton W. Kiracofe, Judge

Trial Court Cause No. 90C01-1808-JT-32

**Tavitas, Judge.**

# Case Summary

[1] In this consolidated appeal, A.E. ("Mother") and D.M., II ("Father") appeal the termination of their parental rights to E.M. (the "Child"). We affirm.

# Issue

[2] Mother and Father each raise one issue, which we restate as whether the evidence is sufficient to support the termination of Mother's and Father's parental rights to the Child.

## Facts

The Child was born in August 2009 to Father and Mother. The Child has an older half-sibling, M.E., who was born to Mother in December 2000. M.E., who "aged out" prior to the conclusion of these termination of parental rights proceedings is not a subject of this appeal. Mother's Br. p. 7 n.1.

The Wells County Department of Child Services ("DCS") became involved with Mother and the children in November 2014 as a result of domestic violence between Mother and Father and concerns about Mother's and Father's substance abuse. Mother and Father abused methamphetamine in 2012 and 2013. A child in need of services ("CHINS") case was initiated and was ultimately closed in December 2015. The children were reunified with Mother at that time. Father pleaded guilty to battery resulting in bodily injury, a Level 6 felony, and he was sentenced to 547 days with 182 days in the Department of Correction and the remainder suspended to home detention.

On September 21, 2016, DCS attempted to interview M.E. regarding a report that Mother was allowing the children to have interactions with a registered sex offender. Mother, however, refused to allow the interview. On September 27, 2016, Mother was arrested for domestic battery, a Class A misdemeanor; criminal trespass, a Class A misdemeanor; and residential entry, a Level 6 felony. DCS then removed the children from Mother's care. At that time, Father was incarcerated for a probation violation after he was charged with residential entry, a Level 6 felony.

DCS filed a petition alleging that the Child was a CHINS. DCS alleged:

 f. On September 23, 2016 allegations were made that [Mother] was not making good decisions and allowing [M.E.] and [the Child] to be around random men.

 g. [Mother] meets with men, sometimes at her own residence with [M.E.] present in the residence, she gets pills and money for meeting with men, she uses the money to pay bills, and she uses drugs.

 h. [Mother] used to be romantically involved with Jeremy Williams.

 i. Jeremy Williams has been convicted of a sex offense.

 j. Jeremy Williams has spent time around both [M.E.] and [the Child].

 k. [M.E.] rode with [Mother] to meet a man to get Aderol [sic] pills from him.

 l. [M.E.] reported that [Mother] asked her to find someone to get [Mother's] Adderall from [sic].

 m. [M.E.] reported that she went to Fort Wayne with her mother on one occasion to meet a man.

 n. [M.E.] reported that her mother didn't want to go alone.

 o. [M.E.] stated that her mother made her sit next to the man and he rubbed her arm and was stocking [sic] her leg.

p. [M.E.] reported that her mother is verbally abusive and physically abusive by calling her names, yelling at her and shoving her.

q. [The Child] reported that her mother yells at her and says bad words.

r. [Mother] was uncooperative with the Indiana Department of Child Services trying to interview [M.E.].

s. [Mother] was arrested on charges of domestic battery for battering her own sister in from [sic] of her sister's daughter. She was arrested and subsequently released on her own recognizance.

t. [M.E.] stated that she was able to get $3700.00 from her mother's boyfriends to go towards [Mother's] bond.

u. [M.E.] stated that "these men" that [Mother] has contact with is [sic] for the purpose of getting their bills paid.

Appellants' App. Vol. II pp. 79-80.

[7]  On January 10, 2017, Mother pleaded guilty to domestic battery, a Class A misdemeanor, and residential entry, a Level 6 felony. Mother was sentenced to 730 days suspended to probation. Mother testified that she also has been charged with driving while suspended at least three times. It appears that Mother's probation was revoked in July 2017 due to drug and alcohol usage, and she was required to serve fifty-eight days executed and 248 days on home detention. On February 3, 2017, Father pleaded guilty to residential entry, a

Level 6 felony, and he was sentenced to 730 days with 290 days executed in the DOC and the remainder suspended to probation.

[8] On March 2, 2017, after an evidentiary hearing, the trial court found that the Child was a CHINS. The trial court issued a dispositional order that required Mother and Father in part to: (1) maintain contact with DCS; (2) engage in a home-based counseling program; (3) complete a substance abuse assessment and follow all recommendations; (4) submit to random drug/alcohol screens; (5) refrain from committing acts of domestic violence and other illegal activities; and (6) attend all scheduled visitations with the Child.

[9] At the beginning of the CHINS proceedings, both Mother and Father maintained contact with DCS; however, contact between DCS and both Mother and Father decreased thereafter. Mother moved residences repeatedly, but Father has lived with his uncle throughout the proceedings.

[10] In February 2017, Mother was making progress toward a trial unsupervised home visit with the Child. Mother, however, tested positive for marijuana, and Mother's visits with the Child returned to fully supervised visits. In November 2017, Mother was again progressing toward a trial unsupervised home visit with the Child. Mother, however, got behind on her bills and lost her housing. Visitations again returned to fully supervised visits.

[11] In late May 2018, a trial unsupervised home visit between the Child and Father was attempted. Father, however, was arrested for public intoxication in mid-

June 2018 during the trial home visit, and the trial home visit was terminated. Father spent two months in jail and was then placed on home detention.

[12] Between March 23, 2017, and December 27, 2018, DCS performed forty-three drug tests on Father, which were negative; however, Father missed twelve drug tests. Father claimed to have been working during the missed tests, but he failed to provide verification to DCS. Father completed a substance abuse assessment in September 2018, and individual therapy was recommended. The therapist wanted to work with Father on his "minimization" of the consequences of his drug and alcohol usage. Tr. Vol. II p. 136. Father attended one therapy session and canceled the second appointment. Father never returned to participate in the individual therapy. Father tested positive for methamphetamine in December 2018, but Father denies the validity of those results. Given the positive drug screen for methamphetamine, the therapist testified that she would now recommend "either a relapse prevention group setting or a modified intensive outpatient setting." *Id.* at 137.

[13] Between September 2016 and December 2018, Mother tested positive for marijuana, alcohol, and methamphetamine, and she tested positive for amphetamine sixty-eight times. Mother missed twenty-four drug screens. Mother last completed a drug screen on January 10, 2019. Mother completed two substance abuse assessments. The first assessment recommended group therapy, which Mother completed. Mother, however, relapsed. A second assessment also recommended group therapy, but Mother failed to complete the therapy.

On August 9, 2018, DCS filed a petition to terminate Mother's and Father's parental rights to the Child. A hearing was held on January 31, 2019, and February 1, 2019. During the CHINS and termination of parental rights proceedings, the Child was placed in the same kinship placement as in the prior CHINS proceeding.

At the time of the hearing on the petition to terminate Mother's and Father's parental rights, Father was still living with his uncle and was employed. Father did not have a driver's license; however, Father's uncle drove Father to places as needed. At the time of the termination of parental rights hearing, Father had a pending allegation that he violated his home detention by testing positive for methamphetamine.

Mother was living with her mother and was unemployed at the time of the termination of parental rights hearing. Mother claimed to have completed some training and to have a job opportunity as a part-time funeral director assistant. Mother testified that she had been "clean" for "over six months" other than occasional marijuana usage. *Id.* at 87. Mother testified that she also took medication for ADD and depression.

On March 26, 2019, the trial court entered findings of fact and conclusions of law terminating Mother's and Father's parental rights to the Child. Mother and Father now appeal.

## Analysis

[18] Mother and Father challenge the termination of their parental relationship with the Child. The Fourteenth Amendment to the United States Constitution protects the traditional rights of parents to establish a home and raise their children. *In re K.T.K. v. Indiana Dept. of Child Services, Dearborn County Office,* 989 N.E.2d 1225, 1230 (Ind. 2013). "[A] parent's interest in the upbringing of [his or her] child is 'perhaps the oldest of the fundamental liberty interests recognized by th[e] [c]ourt[s].'" *Id.* (quoting *Troxel v. Granville,* 530 U.S. 57, 65, 120 S. Ct. 2054 (2000)). We recognize that parental interests are not absolute and must be subordinated to the child's best interests when determining the proper disposition of a petition to terminate parental rights. *Id.* Thus, "'[p]arental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities by failing to provide for the child's immediate and long-term needs.'" *K.T.K.,* 989 N.E.2d at 1230 (quoting *In re D.D.,* 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*).

[19] When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *In re C.G.,* 954 N.E.2d 910, 923 (Ind. 2011). We consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* We must also give "due regard" to the trial court's unique opportunity to judge the credibility of the witnesses. *Id.* (quoting Ind. Trial Rule 52(A)).

[20]     Pursuant to Indiana Code Section 31-35-2-8(c), "[t]he trial court shall enter findings of fact that support the entry of the conclusions required by subsections (a) and (b)" when granting a petition to terminate parental rights.[1] Here, the trial court did enter findings of fact and conclusions of law in granting DCS's petition to terminate Mother's and Father's parental rights. When reviewing findings of fact and conclusions of law entered in a case involving the termination of parental rights, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* We will set aside the trial court's judgment only if it is clearly erroneous. *Id.* A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment. *Id.*

[21]     Indiana Code Section 31-35-2-8(a) provides that "if the court finds that the allegations in a petition described in [Indiana Code Section 31-35-2-4] are true, the court shall terminate the parent-child relationship." Indiana Code Section

---

[1] Indiana Code Sections 31-35-2-8(a) and (b), governing termination of a parent-child relationship involving a delinquent child or CHINS, provide as follows:

    (a)  Except as provided in section 4.5(d) of this chapter, if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court shall terminate the parent-child relationship.

    (b)  If the court does not find that the allegations in the petition are true, the court shall dismiss the petition.

31-35-2-4(b)(2) provides that a petition to terminate a parent-child relationship involving a child in need of services must allege, in part:

> (A)   That one (1) of the following is true:
>
>> (i)   The child has been removed from the parent for at least six (6) months under a dispositional decree.
>>
>> (ii)   The court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.
>>
>> (iii)   The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child.
>
> (B)   that one (1) of the following is true:
>
>> (i)   There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

> (ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> (iii)    The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C)    that termination is in the best interests of the child; and
>
> (D)    that there is a satisfactory plan for the care and treatment of the child.

DCS must establish these allegations by clear and convincing evidence. *In re V.A.*, 51 N.E.3d 1140, 1144 (Ind. 2016).

### A. Father's Challenge to Findings

[22]    Father challenges the following findings:

> 16. Mother and Father have a history of substance abuse.
>
> 17. Beginning in March 2017, DCS began drug screening Father. Father failed to call in and/or take a drug screen on twelve (12) occasions when requested. He was tested forty-three (43) times, and tested positive for methamphetamine on December 3, 2018.
>
> * * * * *
>
> 29. Father completed a substance abuse assessment. The assessment recommended Father complete individual therapy. Father minimized the consequence of substance abuse. Father

only met with the alcohol and drug therapist at Park Center one (1) time after the completion of the assessment.

Appellants' App. Vol. II pp. 32-33.

[23] Father argues that he passed multiple drug screens during the proceedings and denies the use of methamphetamine. Mother, however, testified that she and Father abused methamphetamine in 2012 and 2013 and that Father was "cooking it at that time." Tr. Vol. II pp. 76, 78. Father admitted to having drug usage issues prior to the first CHINS proceeding.

[24] Father tested positive for methamphetamine on December 3, 2018. On that day, Father contacted the family case manager to tell her "he was unable to make it to the office" because he was sick. *Id.* at 122. The family case manager knew that Father failed to call for drug testing the prior week and knew that Father was scheduled for a drug test. When the family case manager told Father that she would come to his house, Father told her "he might be sleeping" and his uncle could wake him. *Id.* The family case manager then went to Father's house to collect the drug test, and Father tested positive.

[25] Father completed a substance abuse assessment in September 2018, which recommended individual therapy. The therapist wanted to work with Father on his "minimization" of the consequences of his drug and alcohol usage. *Id.* at 136. Father attended one therapy session and canceled the second appointment. Father never returned to participate in the individual therapy.

The evidence presented by DCS supports the trial court's findings regarding Father's drug usage. The trial court's findings on this issue are not clearly erroneous.[2]

## B. Remedy of Conditions Resulting in Removal

Mother and Father challenge the trial court's conclusion that there is "a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied."[3] I.C. § 31-35-2-4(b)(2). "In determining whether 'the conditions that resulted in the [Child's] removal . . . will not be remedied,' we 'engage in a two-step analysis.'" *In re E.M.,* 4 N.E.3d 636, 642-43 (Ind. 2014) (quoting *K.T.K.,* 989 N.E.2d at 1231). "First, we identify the conditions that led to removal; and second, we 'determine whether there is a reasonable probability that those conditions will not be remedied.'" *Id.* In analyzing this second step, the trial court judges the parent's fitness "as of the time of the termination

---

[2] Father also challenges the trial court's findings regarding the testimony of the guardian ad litem ("GAL"). We will address Father's argument in the context of analyzing the Child's best interest.

[3] Mother and Father also argue that there was no reasonable probability that the continuation of the parent-child relationship posed a threat to the well-being of the Child. Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive. Consequently, the DCS was required to demonstrate by clear and convincing evidence of a reasonable probability that *either*: (1) the conditions that resulted in the Child's removal or the reasons for placement outside the home of the parents will not be remedied, or (2) the continuation of the parent-child relationship poses a threat to the well-being of the Child. *See, e.g., Bester v. Lake County Office of Family & Children*, 839 N.E.2d 143, 148 n.5 (Ind. 2005). The trial court here found a reasonable probability that the conditions that resulted in the Child's removal or reasons for placement outside the home of the parents will not be remedied, and there is sufficient evidence to support that conclusion. Accordingly, we do not address whether the continuation of the parent-child relationship poses a threat to the well-being of the Child.

proceeding, taking into consideration evidence of changed conditions." *Id.* (quoting *Bester,* 839 N.E.2d at 152). "We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination." *Id.* "Requiring trial courts to give due regard to changed conditions does not preclude them from finding that parents' past behavior is the best predictor of their future behavior." *Id.*

[28] The trial court concluded, here, that there is a reasonable probability that the conditions that resulted in the Child's removal or the reason for continued placement outside the home of the parents will not be remedied. In support of this conclusion, the trial court made extensive findings of fact. The trial court found:

> 12. Father has an extensive criminal history as evidenced by State's Exhibits 26-38 and 47-51, which includes convictions for battery, invasion of privacy, residential entry, as well as violations of community supervision.
>
> 13. Mother also has an extensive criminal history as evidenced by State's Exhibits 39-46.
>
> 14. During the pendency of the CHINS matter, Mother was convicted of domestic battery and residential entry. She was sentenced to two hundred seventy-five (275) days of home detention.
>
> 15. At the time of the child's removal from the home, Father was incarcerated.

16.    Mother and Father have a history of substance abuse.

17.    Beginning in March 2017, DCS began drug screening Father. Father failed to call in and/or take a drug screen on twelve (12) occasions when requested. He was tested forty-three (43) times, and tested positive for methamphetamine on December 3, 2018.

18.    During the underlying CHINS case, Mother has missed twenty-four (24) drug screens and tested positive for THC and methamphetamine, which were not prescribed to her, and alcohol.

19.    Mother's use of substances caused her to violate the terms and conditions of her home detention and probation. Consequently, Mother was ordered to serve twenty (20) days in jail.

20.    [The Child] was returned to Father's care under a trial home visit in May 2018.

21.    During the trial home visit, Father was arrested for public intoxication. At the time of his arrest, [the Child] was in the care of Father's aunt. Father was incarcerated for six (6) days and placed on probation.

22.    At the time of the fact-finding hearing, a petition seeking revocation of Father's suspended sentence and probation had been filed and was pending.

23.    Throughout the pendency of the CHINS matter, Father has resided with his uncle.

24.    Father has also maintained employment.

25.     Father does not have a valid driver's license.

26.     Mother has not been able to maintain stable housing and currently resides with her mother more than an hour away from Wells County, Indiana.

27.     Mother has a valid driver's license, but does not have a source of transportation. Due to the lack of transportation, Mother frequently missed visitations with the child.

28.     Mother has frequently missed drug screens and as of the date of the fact-finding hearing, DCS could not verify her claims of sobriety.

29.     Father completed a substance abuse assessment. The assessment recommended Father complete individual therapy. Father minimized the consequence[s] of substance abuse. Father only met with the alcohol and drug therapist at Park Center one (1) time after the completion of the assessment.

Appellants' App. Vol. II pp. 32-33.

[29]     The Child was initially removed because Father was incarcerated, Mother allowed the Child to be around a registered sex offender, and Mother abused drugs. Father and Mother argue that they remedied the conditions that caused removal. Father argues that, although he was incarcerated at the time of the Child's removal, he is no longer incarcerated and that he is maintaining employment. Mother's main argument seems to be that she has not been provided with enough time to demonstrate her ability to parent the Child.

Mother contends that she has demonstrated "remarkable change." Mother's Br. p. 21. According to Mother, she has taken classes, has employment arranged, has been "clean" for six months except occasional marijuana usage, and has been actively engaged in therapy and case management services. *Id.* at 22. Mother argues that she should have been given the opportunity to start her new employment and continue with her services.

[30] The family case manager testified that Mother has not remedied the conditions resulting in the Child's removal. Mother does not have housing or employment and continues to be dependent on various men. Father has housing and employment; however, "he has had a history of being in and out of jail." Tr. Vol. II p. 113. The family case manager repeatedly talked to Father about his "poor judgment and poor choices." *Id.* at 115. Neither Mother nor Father has benefitted from substance abuse services offered, and they continue to test positive for illegal substances.

[31] Although Mother has plans for the future that are admirable, the fact remains that the Child has been removed from Mother's care for more than two years with minimal improvement in Mother's situation. Mother and Father continue to make poor choices, and the Child should not be required to be put "on a shelf" to wait any longer. *See Matter of Campbell*, 534 N.E.2d 273, 275 (Ind. Ct. App. 1989) ("We are unwilling to put [the child] on a shelf until her parents are capable of caring for her appropriately. Two years without improvement is long enough."). Accordingly, the trial court's conclusion is not clearly erroneous.

## B. Child's Best Interests

[32] Both Mother and Father argue that it was not in the Child's best interests to terminate their parental rights. In determining what is in the best interests of a child, the trial court is required to look at the totality of the evidence. *Z.B. v. Indiana Dep't of Child Servs.*, 108 N.E.3d 895, 903 (Ind. Ct. App. 2018), *trans. denied*. In doing so, the trial court must subordinate the interests of the parents to those of the child involved. *Id.* Termination of a parent-child relationship is proper where the child's emotional and physical development is threatened. *K.T.K.*, 989 N.E.2d at 1235. A trial court need not wait until a child is irreversibly harmed such that his or her physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.* Additionally, a child's need for permanency is a "central consideration" in determining the best interests of a child. *Id.*

[33] Mother argues that she has "the ability, and plan, to provide adequate housing, stability and care for the Child" and that it is in the Child's best interest that Mother be allowed "the chance to complete services, maintain housing, start her employment and be reunified with the Child." Mother's Br. p. 25.

[34] Father argues that he and the Child love each other and get along well, that he has stable housing and employment, and that he can provide a safe environment for the Child. Father also contends that the GAL "did not perform a reasonable investigation" because the GAL was merely "an echo-chamber for the DCS." Father's Br. p. 16. According to Father, the GAL had

never met the Child and "did nothing more than talk with the DCS case manager and read the DCS reports." *Id.*

[35] The GAL testified that she was also involved with the prior CHINS proceeding and that, although she was only around the Child once during this termination of parental rights proceeding, she spent "significant time" with M.E. Tr. Vol. II p. 153. The GAL testified that she gathers information "from lots of different sources." *Id.* at 151. The GAL had many concerns with Mother and Father— mainly that they have shown little improvement over the course of two CHINS proceedings. The GAL testified that her concern is that Mother and Father "really haven't been able to address the things that continue to get into their way to provide any kind of stable home for this child." *Id.* at 155. The record does not support Father's assertion that the GAL was merely an "echo-chamber for the DCS." Father's Br. p. 16. The GAL demonstrated that she was familiar with the family due to her involvement with the current and prior CHINS proceedings; she spent significant time with the Child's sister, M.E.; and she was well aware of the issues Mother and Father continued to present. The trial court did not err by relying on the GAL's testimony.

[36] The Child has been in one kinship placement for over two years, and she was in the same placement during the prior CHINS proceedings. She is "very familiar" with the placement, and "she has never had any concerns in that home." *Id.* at 113-114. The Child loves the family, "knows what to expect in their home," knows that "things are not gonna [sic] change," and "feels extremely comfortable and is able to talk to them about anything." *Id.* at 114.

The family case manager "see[s] a whole different side of [the Child] when [she sees] her with them than with anybody else." *Id.* Both the GAL and the family case manager testified that termination of Mother's and Father's parental rights was in the Child's best interest. Given the circumstances here, we cannot say the trial court's conclusion that termination of parental rights was in the Child's best interest is clearly erroneous.

### C. Adequate Plan

[37] Finally, Mother challenges the trial court's finding that there is a satisfactory plan for the care and treatment of the Child. Indiana courts have held that for a plan to be "'satisfactory'" for the purposes of the termination statute, it "'need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated.'" *In re A.S.*, 17 N.E.3d 994, 1007 (Ind. Ct. App. 2014) (quoting *Lang v. Starke Cnty. Office of Family and Children*, 861 N.E.2d 366, 375 (Ind. Ct. App. 2007), *trans. denied*), *trans. denied*.

[38] DCS is only required to offer a general sense of the plan for the Child after termination of Mother's and Father's parental rights. DCS's plan is for the Child to be adopted by her current kinship placement, and adoption is a satisfactory plan. *See, e.g., Lang*, 861 N.E.2d at 375 (holding that adoption and independent living are satisfactory plans). The trial court's finding that DCS had a satisfactory plan is not clearly erroneous.

# Conclusion

[39] The trial court's termination of Mother's and Father's parental rights is not clearly erroneous. We affirm.

[40] Affirmed.

Brown, J., and Altice, J., concur.