## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Oct 30 2019, 8:52 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Steven J. Halbert
Indianapolis, Indiana

Valerie K. Boots
Marion County Public Defender Agency
Appellate Division
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
INDIANA DEPARTMENT OF CHILD
SERVICES

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Robert J. Henke
Deputy Attorneys General
Indianapolis, Indiana

ATTORNEY FOR APPELLEE CHILD
ADVOCATES, INC.[1]

DeDe K. Connor
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

---

[1] Child Advocates, Inc. did not file a separate appellee's brief.

In the Matter of the Termination of the Parent-Child Relationship of B.J.G., Mother, and B.G., Minor Child,

B.J.G.,

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner,*

and

Child Advocates, Inc.,

*Appellee-Guardian Ad Litem.*

October 30, 2019

Court of Appeals Case No. 19A-JT-976

Appeal from the Marion Superior Court

The Honorable Marilyn A. Moores, Judge The Honorable Scott Stowers, Magistrate

Trial Court Cause No. 49D09-1809-JT-1118

**Kirsch, Judge.**

[1] B.J.G. ("Mother") appeals the juvenile court's order involuntarily terminating her parental rights to her child, B.G. ("Child"), raising the following restated issues:

 I.  Whether the juvenile court's findings are generally defective because the Indiana Department of Child Services ("DCS") did not present evidence to reflect Mother's "current conditions" at the time of the termination hearing; and

 II.  Whether the judgment terminating Mother's parental rights was clearly erroneous because DCS failed to

> demonstrate by clear and convincing evidence that Mother posed a threat to Child's well-being or that the conditions resulting in Child's removal would not be remedied.

We affirm.

## Facts and Procedural History

Child was born to Mother on August 4, 2017.[2] Three days later, DCS filed a petition alleging that Child was a child in need of services ("CHINS") because Child was born "drug exposed."[3] *Tr. Vol. II* at 115. Child remained in the hospital's neonatal intensive care unit for about a month. *Id*. at 133. Meanwhile, the CHINS court removed Child from Mother's care and custody following an August 8, 2017 "Initial/Detention Hearing" and ordered Child to be placed in foster care upon her release from the hospital. *Ex. Vol. I* at 84. Child was adjudicated a CHINS on October 5, 2017, after Mother admitted she "need[ed] assistance to maintain sobriety . . . [and] the coercive intervention of the Court [was] necessary to ensure [Child's] safety and well-being." *Id*. at 65. Following a November 2, 2017 hearing, the CHINS court entered a

---

[2] The parent-child relationship between Child and Child's biological father was terminated by default on February 15, 2018, and he does not participate in this appeal. *Ex. Vol. I* at 35. Accordingly, we set forth only the facts that pertain to Mother.

[3] The CHINS petition included an allegation that Child was born with fetal alcohol syndrome or with controlled substance or legend drug in Child's body. *Ex. Vol. I* at 50. Because Mother admitted that Child was a CHINS, there was no fact-finding during the CHINS hearing. Accordingly, specific material facts were redacted from the CHINS petition prior to it having been admitted into evidence. *Tr. Vol. II* at 77; *Ex. Vol. I* at 50. However, explanation of Child's "drug exposure" can be found elsewhere in the record. *See Tr. Vol. II* at 23, 24 (Mother began using opioids around age twenty-four and began using heroin at age twenty-five; Child was born one month shy of Mother turning twenty-six).

dispositional order, directing Mother to participate in reunification services. *Id.* at 56. Mother was incarcerated at that time; however, because she was scheduled to be released in December 2017, the CHINS court ordered Mother to contact DCS within seventy-two hours of her release. *Id.* at 57.

[4] Mother had four children, including Child. *Tr. Vol. 2* at 22. Seven months prior to Child's birth, DCS filed a CHINS petition as to Child's half-siblings, K.H. and L.P. *Ex. Vol. I* at 140-43. During a January 26, 2017 pre-trial hearing, Mother admitted that K.H. and L.P. needed services and that the CHINS court's intervention was necessary because Mother "need[ed] assistance in maintaining a home free from substance abuse." *Id.* at 120. K.H. and L.P. were not returned to Mother's care.[4]

[5] On May 10, 2017, when she was six months pregnant with Child, Mother was arrested and charged with Level 6 felony possession of cocaine and Class B misdemeanor possession of marijuana. *Ex. Vol. II* at 4. The trial court issued multiple warrants for Mother's failure to appear while the case moved toward trial. *Id.* at 4, 6, 7, 8. On January 15, 2019, pursuant to a plea agreement, Mother pleaded guilty to possession of cocaine, and the State dismissed the possession of marijuana count. *Id.* at 16. The trial court sentenced Mother to 365 days in jail, all of which was suspended. *Id.* at 16, 19. As a condition of

---

[4] In March 2017, the CHINS court dismissed the case as to K.H. and granted K.H.'s father sole physical custody. *Ex. Vol. I* at 110, 202. In September 2018, L.P. was placed in L.P.'s father's care on the recommendation of father's home-based case manager. *Id.* at 162.

that suspension, the trial court ordered Mother to participate in weekly drug screens and complete a substance abuse assessment.[5] *Id*. at 16, 19.

[6] Meanwhile, on August 19, 2017, about a week after DCS had filed the CHINS petition regarding Child, Mother again was charged with multiple drug-related crimes. *Id*. at 23. Those crimes were charged separately under cause numbers 49G20-1708-F3-30521 and 49G20-1708-F4-30079. *Id*. at 23, 38. Mother "was apparently incarcerated on [those] charges until December 2017." *Appellee's Br*. at 7 (citing *Tr. Vol. II* at 30). The trial court dismissed cause number 49G20-1708-F4-30079 on February 2, 2018. *Ex. Vol. II* at 38, 43. On January 7, 2019, Mother pleaded guilty in cause number 49G20-1708-F3-30521 to dealing in cocaine and received a sentence of 1095 days; Mother had served 112 days, had earned credit for 37 days, and the remaining 946 days were suspended. *Id*. at 35.

[7] On August 23, 2018, after Mother had been charged, but before she had pleaded guilty to possession of cocaine and dealing in cocaine, the CHINS court held a permanency hearing and modified Child's permanency plan to adoption. *Ex. Vol. I* at 35. In support of that modification, the CHINS court found: (1) Child's case had been open for a year and no service provider was recommending that Child be returned to the care of Mother; (2) although Mother said she was going "in-patient for drug treatment," her whereabouts

---

[5] The record before us contains no information about whether Mother participated in these court-ordered drug screens and substance abuse assessments.

were unknown to DCS; (3) Mother continued to struggle with drug abuse; (4) during the one-year period that Child's case had been open, Mother made no meaningful progress toward sobriety; (5) Mother had not consistently visited Child, and when she did, she often ended the visits early; and (6) Mother did not successfully complete home-based services.[6] *Id.*

[8]     On September 21, 2018, after Mother had pleaded guilty to two cocaine-related offenses, DCS filed a petition to terminate Mother's parental rights ("TPR"). *Appellant's App. Vol. II* at 17. The juvenile court held a fact-finding hearing on January 16 and February 26, 2019. *Tr. Vol. II* at 2. During the hearing, Joy Boyd ("Boyd"), a therapist with Families First Indiana, testified that she received Mother's referral for home-based therapy in December 2017. *Id.* at 97. Boyd stated that she met with Mother four to five times a month. *Id.* at 98. Initially, Mother was "very engaging" but at times Mother struggled to stay focused and was inconsistent in her attendance. *Id.* Boyd testified that during their sessions Mother had difficulty focusing on her established treatment plan goals; Mother appeared preoccupied and even disinterested during sessions. *Id.* at 101. There were periods of time when Mother would not schedule, would cancel, or would not show up for appointments. *Id.* at 98. On June 13, 2018,

---

[6] Mother contends that there was no evidence or testimony regarding her drug usage from April 2018 through the termination hearings in January and February 2019. *Appellant's Br.* at 6. We disagree. During the termination hearing, Rondre Smith, a home-based case worker with Hope Counseling Associates, testified, "On the 17th of August, [2018] I received a text message from [Mother] stating that she wasn't able to have her visit [with Child,] and that she was going to pursue rehab." *Tr. Vol. 2* at 54. Thus, Mother clearly had an issue with drug abuse even after her last drug screen in April 2018.

since Mother had not successfully completed the goals she set with Boyd at the beginning of their work together, Boyd discharged Mother "due to her lack of progress." *Id*. at 103, 109. At the time of Mother's discharge, Boyd was concerned about Mother's emotional regulation, stability, and sobriety. *Id*. at 104.

[9] Megan McCully ("McCully"), a substance abuse counselor with Families First, testified that Mother took part in a substance abuse assessment on April 12, 2018. *Tr. Vol. II* at 19. Mother told McCully that she began using opioids at age twenty-four and began using heroin when she was twenty-five. *Id*. at 23. McCully said that Mother had streaks of sobriety but her tolerance for certain drugs suggested that she had used drugs longer than one year. *Id*. at 25. Mother claimed that she had abstained from drug use from August 2017 through January 2018. *Id*. at 30. This sobriety was achieved without formal treatment; however, McCully said that Mother was incarcerated most of the time when she was sober. *Id*. at 30-31. Mother admitted to McCully that she relapsed and resumed using heroin from February through April 2018. *Id*. at 23. In fact, Mother said she had even used heroin the night before her April 2018 substance abuse assessment. *Id*. Mother admitted to McCully that she sometimes used drugs at home when her other children were asleep yet claimed that a sober person was always in the house at the time. *Id*. at 26.

[10] McCully testified that she referred Mother to a sixteen-week intensive outpatient program ("IOP") to address substance abuse issues. *Id*. at 31. The administrator of that program, Shannon Alford ("Alford"), explained that, each

week for the first eight weeks, a client must attend three, three-hour sessions. *Id.* at 35. Additionally, a client must attend two recovery support meetings per week and must take a weekly drug screen. *Id.* "The second part of treatment is a step down where [clients] come one time a week for two hours and still have to fulfill those other requirements." *Id.* Alford explained that IOP has a "three absence rule" and if a client is a "no call" or "no show" within the first three sessions, they are automatically discharged. *Id.* at 36-37. Mother was supposed to begin IOP classes on April 20, 2018; however, she missed the first three sessions and was "unsuccessfully discharged" on April 27, 2018.[7] *Id.* at 37.

[11] Mother's urine drug screen, taken on April 12, 2018, tested positive for buprenorphine, norbuprenorphine, fentanyl, and norfentanyl. *Id.* at 90; *Ex. Vol. I* at 9. Mother had a second screen on April 19, 2018 and tested positive for fentanyl, norfentanyl, and morphine. *Tr. Vol. II* at 11; *Ex. Vol. I* at 5. During her February 26, 2019 testimony, DCS family case manager Tianna Ceaser ("FCM Ceaser") testified that she receives lab reports when a parent submits to drug screens. *Tr. Vol. II* at 124. During her February 2019 testimony, FCM Ceaser said she had not received a report about Mother's screening for at least six months. *Id.* at 125.

---

[7] Citing to Petitioner's Exhibit 19, Mother contends, "The caseworkers were in agreement that [Mother] was cooperative and compliant with services up through April 2019." *Appellant's Br.* at 7. We note that Exhibit 19 is dated April *2018* and, therefore, it cannot support a proposition that refers to 2019.

[12] In June 2018, Mother's case was transferred from Boyd to Elsbury, a home-based therapist with Families First. *Id*. at 39. Elsbury completed Mother's intake on June 27, 2018. *Id*. The first time Mother appeared for her assessment, she had a panic attack in the lobby while awaiting the appointment. *Id*. at 42. Elsbury and Mother spoke to neutralize the panic attack and brainstorm about how Mother could successfully attend a future assessment. *Id*. at 45. Elsbury rescheduled the assessment, making it a one-on-one session and setting the time so that Mother could avoid a long wait in the lobby. *Id*. at 47. Elsbury met with Mother at home just prior to the appointment and offered to give Mother a ride. *Id*. Mother declined the offer and did not attend the drug assessment. *Id*.

[13] In early July 2018, Elsbury began therapy with Mother once a week. Later, therapy increased to twice a week at Mother's request. *Id*. at 39, 40. Mother met with Elsbury five times and was initially engaged during sessions. *Id*. However, during Mother's last session, on July 31, 2018, she was distracted and hard to engage. Mother then had "three no call no shows." *Id*. at 41. Pursuant to Families First policy—that a client must be discharged after "three no call no shows"—Mother was "unsuccessfully discharged" on August 21, 2018. *Id*.

[14] Rondre Smith ("Smith"), a home-based case worker with Hope Counseling Associates, testified that it was his job to oversee visitation and connect Mother with resources in the community, such as housing, employment, transportation, and substance abuse programs. *Id*. at 53. Smith worked with Mother for about seven months, beginning in December 2017. *Id*. at 53-54. Smith testified that,

during that time, Mother remained unemployed. *Id*. at 56. While Mother found housing, Smith testified that Mother's housing was not stable; during the seven months they worked together, Mother moved three times. *Id*. at 62. After Mother's third move, where she lived with her godmother, Mother no longer tried to find her own place to live. *Id*. at 60.

[15] Smith said that Mother was also inconsistent about attending supervised visits with Child. *Id*. at 54. Mother complied in the beginning, but by late July or early August 2018, Mother became difficult to contact and often cancelled or failed to attend scheduled visits with Child. *Id*. Mother's last visit with Child occurred on August 10, 2018. *Id*. On August 17, 2018, Mother texted Smith to say she was not able to have her visit with Child, and "she was going to pursue rehab." *Id*. The visitation referral closed on August 24, 2018 due to lack of contact, and Smith discharged Mother from the program. *Id*. at 55. Smith had no contact with Mother after her discharge, and at the time of the fact-finding hearing, Smith had not known the status of Mother's employment or housing for about six months. *Id*. at 56-57, 61-62.

[16] Regarding Child's best interest, FCM Ceaser testified: (1) it was in Child's best interest to terminate the parent-child relationship; and (2) Mother should not be given additional time to prove her ability to parent. *Id*. at 121. The guardian ad litem ("GAL") testified that he had recommended during the August 23, 2018 permanency hearing that Child's plan be changed from reunification to adoption. *Id*. at 136. The GAL believed termination was in the best interests of Child. *Id*. at 137, 139. The GAL based this opinion on his belief that Mother

was not appropriately engaged in services and had not remedied her substance abuse disorder. *Id*. at 137. The GAL found that Mother had not remedied the reasons for DCS involvement. *Id*. at 137-38. The GAL further considered that the foster home placement, which was pre-adoptive, was nurturing and met Child's needs. *Id*. at 137.

[17] One of Child's foster parents testified that Child had lived with her family since September 2017, when Child was released from hospital. Child arrived at foster parents' home with some special needs; Child had stiff and rigid muscles and issues with stomach aches. *Id*. at 67. In addition to caring for Child, the foster parents had taken Child to physical therapy to alleviate the rigidity of her muscles. *Id*. at 70. Child had bonded to her foster parents, who testified that they were prepared to adopt Child. *Id*. at 69.

[18] On March 25, 2019, the juvenile court issued findings of fact and conclusions of law, terminating Mother's parent-child relationship. *Appellant's App. Vol. II* at 124-27. The juvenile court concluded:

> 46. There is a reasonable probability that the conditions that resulted in the child's removal and continued placement outside of the home will not be remedied by her mother. [Mother] continues to struggle with drug abuse. She has failed to complete any services designed to address substance abuse and stability issues. She has not maintained contact with the FCM and has made no significant or sustained progress towards reunification.

> 47. Continuation of the parent-child relationship poses a threat to the child's well-being in that it would serve as a barrier for her obtaining permanency through an adoption when her mother is

unable to provide permanency and parent. [Mother] has not seen [Child] since August 2018 and after previous parenting time sessions, the child would suffer sleep disruptions.

48. Termination of the parent-child relationship is in [C]hild's best interests. Termination would allow her to be adopted into a stable and permanent home where her needs will be safely met.

49. There exists a satisfactory plan for the future care and treatment of [C]hild, that being adoption.

50. The Guardian ad Litem agrees with the permanency plan of adoption as being in [C]hild's best interests.

*Id*. at 127. Mother now appeals the termination of her parental rights.

# Discussion and Decision

[19] As our Supreme Court has observed, "Decisions to terminate parental rights are among the most difficult our trial courts are called upon to make. They are also among the most fact-sensitive—so we review them with great deference to the trial courts[.]" *In re E.M.*, 4 N.E.3d 636, 640 (Ind. 2014). While the Fourteenth Amendment to the United States Constitution protects the traditional right of a parent to establish a home and raise her child, and parental rights are of a constitutional dimension, we may terminate those rights when a parent is unable or unwilling to meet her responsibilities as a parent. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1230 (Ind. 2013).

[20] Thus, parental rights are not absolute and must be subordinated to the child's best interest in determining the appropriate disposition of a petition to terminate

the parent-child relationship. *Id*. The purpose of terminating parental rights is not to punish the parent but to protect the child. *Z.B. v. Ind. Dep't of Child Servs.*, 108 N.E.3d 895, 902 (Ind. Ct. App. 2018), *trans. denied*. The juvenile court need not wait until the child is irreversibly harmed, such that her physical, mental, and social development is permanently impaired, before terminating the parent-child relationship. *Id*. at 903. The court must judge a parent's fitness to care for her children at the time of the termination hearing. *A.D.S v. Ind. Dep't of Child Servs.,* 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013), *trans. denied*. However, requiring trial courts to give due regard to changed conditions "does not preclude them from finding that parents' past behavior is the best predictor of their future behavior." *E.M.*, 4 N.E.3d at 643.

[21] When reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *Z.B.*, 108 N.E.3d at 900. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *In re H.L.*, 915 N.E.2d 145, 149 (Ind. Ct. App. 2009). Where, like here, the juvenile court entered specific findings and conclusions, we apply a two-tiered standard of review. *In re B.J.*, 879 N.E.2d 7, 14 (Ind. Ct. App. 2008), *trans. denied*. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id*. Moreover, in deference to the trial court's unique position to assess the evidence, we will not set aside the court's judgment terminating a parent-child relationship unless it is clearly erroneous. *H.L.*, 915 N.E.2d at 148-

49. If the evidence and inferences support the trial court's decision, we must affirm. *A.D.S.*, 987 N.E.2d at 1156.

[22]   Before an involuntary termination of parental rights may occur, DCS is required to allege and prove, among other things:

(A) that one (1) of the following is true:

(i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

. . . .

(B) that *one* (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove the alleged circumstances by clear and convincing evidence. *In re H.L.*, 915 N.E.2d at 149. If the juvenile court finds that the allegations in a petition are true, it shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

## I. Findings

Mother does not contest the accuracy of the juvenile court's specific factual findings. Instead, Mother claims that those findings are generally defective because DCS did not present evidence to reflect Mother's "current conditions" at the time of the termination hearing. *Appellant's Br.* at 10. We disagree. Mother concedes that her substance abuse problem led to the removal of Child immediately after Child's August 2017 birth. *Id.* at 9. Nevertheless, Mother contends that the evidence presented at the termination hearing showed that Mother had maintained sobriety after Child's birth for about six or seven months, August 2017 through January 2018. *Id.* Mother also asserts that her August 2018 statement to McCully, that she was going to rehab, revealed that Mother "was taking positive steps on her own to address her history of abuse." *Id.*

From Mother's offered evidence, we cannot extrapolate that Mother was drug free and stable at the time of the termination hearing. In August 2018, Mother texted Smith to say "she was going to pursue rehab"; however, Mother did not inform Smith as to the rehab location nor did she provide proof of participation. *Tr. Vol. II* at 54. Mother and Smith had no additional contact after August

2018. *Id*. Furthermore, although DCS had referred Mother to various home-based therapists, caseworkers, and drug counselors, those providers testified that Mother was discharged from each of their programs because Mother was either not progressing in services or had stopped attending services. After Mother was unsuccessfully discharged from various programs, she had no additional contact with DCS or her providers. Here, Mother is the one who prevented DCS from knowing about Mother's current status at the time of the termination hearing; therefore, we cannot now give Mother the benefit of assuming that she is drug free and stable. Because Mother does not challenge the juvenile court's specific findings, we must accept those findings as true. *See In re S.S.,* 120 N.E.3d 605, 610 (Ind. Ct. App. 2019) (citing *McMaster v. McMaster,* 681 N.E.2d 744, 747 (Ind. Ct. App. 1997)) (where parent has not challenged factual findings, court on appeal "must accept the findings as true").

## II. Conclusions

[25] Mother, likewise, does not contest the juvenile court's conclusions that: (1) Child has been removed from Mother's care for at least six months under a dispositional order; (2) the termination is in the best interest of Child; and (3) adoption is a satisfactory plan for the care and treatment of Child. *Appellant's App. Vol. II* at 127. Instead, Mother argues that DCS did not meet its burden of proving under Indiana Code section 31-35-2-4(b)(2)(B) that conditions resulting in Child's removal will not be remedied and that the continuation of Mother's relationship with Child poses a threat to Child's safety. *Appellant's Br.* at 10, 14.

[26] It is well-settled that because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, the juvenile court need find *only one* of the following: (1) the conditions resulting in removal from or continued placement outside the parent's home will not be remedied; (2) the continuation of the parent-child relationship poses a threat to the child; *or* (3) the child has been adjudicated a CHINS on two separate occasions. *See In re D.D.*, 804 N.E.2d 258, 266 (Ind. Ct. App. 2004), *trans. denied*. Therefore, where one of these three factors has been proven by clear and convincing evidence, it is not necessary for DCS to prove, or for the juvenile court to find, any of the other factors listed in Indiana Code section 31-35-2-4(b)(2)(B). *Id*. Accordingly, here, we focus only on the question of whether the conditions that led to Child's removal and placement outside Mother's care will not be remedied.

[27] When deciding whether there is a reasonable probability that the conditions resulting in a child's removal or continued placement outside of a parent's care will not be remedied, the juvenile court must determine a parent's fitness to care for the child at the time of the termination hearing while also taking into consideration evidence of changed circumstances. *A.D.S.*, 987 N.E.2d at 1156-57. The juvenile court may disregard efforts made only shortly before termination and give more weight to a parent's history of conduct prior to those efforts. *K.T.K.*, 989 N.E.2d at 1234.

[28] Mother has a total of four children, none of whom were in Mother's care at the time of the termination hearing. Mother began using opioids when she was twenty-four years old and heroin when she was twenty-five. *See Tr. Vol. II* at

23, 24. When Mother was two months pregnant with Child, DCS filed a CHINS petition regarding two of Mother's other children, K.H. and L.P. *Ex. Vol. I* at 140-43. While Mother's rights to those children were not terminated, those children now live with their respective fathers. *Id.* at 110, 162, 202. When Mother was six months pregnant with Child, Mother was charged with drug-related crimes. Child was born "drug exposed." *Tr. Vol. II* at 115-16. While Child remained in intensive care for about a month, Child was removed from Mother's custody after Mother admitted that Child was a CHINS. A few days after Child's birth, Mother was again charged with drug-related crimes. *Ex. Vol. II* at 23. Mother was incarcerated and remained in jail until December 2017. Meanwhile, the CHINS court proceeded to disposition and ordered Mother to contact DCS within seventy-two hours of her release and, thereafter, participate in services toward reunification with Child. *Appellant's App. Vol. II* at 125.

[29] It is true that Mother was sober after Child's birth, from August 2017 through January 2018; however, Mother was incarcerated for at least four of those months. *Tr. Vol. II* at 30-31. Furthermore, Mother began to use drugs again in February 2018 and even used drugs the night before she was due to have her April 12, 2018, scheduled drug abuse assessment. *Appellant's App. Vol. II* at 132. DCS provided Mother with numerous service providers. Home-based therapist Boyd worked with Mother from December 2017 through June 2018 but discharged Mother as unsuccessful due to her lack of progress. *Tr. Vol. II* at 103. Boyd remained concerned about Mother's emotional regulation, stability,

and sobriety and referred Mother to Elsbury. *Id*. at 104. Mother's intake with Elsbury occurred on June 27, 2018. Mother attended a total of five sessions; however, by the end of July 2018, Mother stopped participating. After Mother had three no call/no shows, was only in the first stage of a five-stage process, and was making no progress, Elsbury unsuccessfully discharged Mother on August 21, 2018.

[30] In August 2018, Mother texted Smith to say "she was going to pursue rehab"; however, Mother provided no proof of participation. *Tr. Vol. II* at 54. Mother and Smith had no additional contact after August 2018. *Id*. After Mother was unsuccessfully discharged from various programs, she had no additional contact with DCS or her providers. Without additional contact, the juvenile court could not assume that Mother was drug free and stable.

[31] Mother did not maintain contact with DCS. Without additional information from Mother, DCS presented clear and convincing evidence that Mother continued to struggle with drug abuse, failed to complete any services designed to address substance abuse and stability issues, and had made no significant sustained progress toward reunification. This evidence supported the juvenile court's conclusion that there is a reasonable probability that Mother will not remedy the conditions resulting in Child's removal. The juvenile court's termination of Mother's parent-child relationship with Child was not clearly erroneous.

[32] Affirmed.

Baker, J., and Crone, J., concur.