## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 18 2019, 10:55 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT A.B.

Joann M. Price Franklin
Merrillville, Indiana

ATTORNEY FOR APPELLANT R.P.

Deidre L. Monroe
Crown Point, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Termination of the Parent-Child Relationship of An.B. and Ar.B. (Minor Children) and A.B. (Father) and R.P. (Mother)

A.B. (Father) and
R.P. (Mother),

*Appellants-Respondents,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner*

December 18, 2019

Court of Appeals Case No.
19A-JT-1349

Appeal from the
Lake Superior Court

The Honorable
Thomas P. Stefaniak, Jr., Judge

Trial Court Cause Nos.
45D06-1808-JT-280
45D06-1808-JT-281

**Vaidik, Chief Judge.**

# Case Summary

[1] A.B. ("Father") and R.P. ("Mother") (collectively, "Parents") appeal the termination of their parental rights to two of their children. We affirm.

# Facts and Procedural History

[2] The facts that follow are taken primarily from the trial court's findings of fact, none of which Parents challenge on appeal.[1] Parents are the biological parents of three children: Am.B., born in 2010, An.B., born in 2013, and Ar.B., born in 2016.

[3] In 2010, the Department of Child Services (DCS) opened the first CHINS case involving Parents because Father "spanked" Mother several times and then fled with three-month-old Am.B. *See* Ex. EEE. Am.B. was found on the side of the road about a block away from Parents' house, lying on wet ground and wearing only one piece of clothing. Father was charged with and pled guilty to Class D felony neglect of a dependent. In November 2011, DCS filed a petition to terminate Parents' parental rights to Am.B. Then in January 2012, Mother pled guilty to Class D felony theft. In May, the court ordered the termination of

---

[1] Because Parents do not challenge the trial court's findings of fact, we accept them as true. *See Maldem v. Arko*, 592 N.E.2d 686, 687 (Ind. 1992).

Parents' parental rights to Am.B., after finding that Parents had been in and out of incarceration since June 2011 and were not participating in services.[2] Then in 2013, An.B. was born. In February 2015, Father pled guilty to Class C felony burglary.

[4] About a year later, in March 2016, DCS received a report that Ar.B. was born positive for marijuana and cocaine. Mother admitted that she used marijuana while pregnant. Father refused to take a drug screen and told DCS that he did not want "anything . . . to do with DCS." Tr. p. 37. DCS was also concerned about Mother's housing. Father had recently kicked Mother out of their house, and she was living in a shelter. However, Father agreed to let Mother move back in. On March 15, DCS filed petitions alleging that An.B. and Ar.B. (collectively, "Children") were in need of services (CHINS). Mother admitted the allegations in the petitions, and Father denied them. Children remained in Mother's custody while she was living with Father.

[5] About a month later, Parents left Children unattended in a car for over an hour. The temperature was forty degrees or less, and Children were not properly dressed. Police arrived and took Children to the police station until DCS arrived. DCS removed Children and placed them in foster care. In April, the trial court found that Children were CHINS and ordered that Children continue to be detained. Later that month, following a dispositional hearing, the court

---

[2] Because Parents' parental rights to Am.B. have been terminated, Am.B. is not involved in this appeal.

ordered that Parents participate in services, including substance-abuse assessments, parenting assessments, home-based casework services, initial clinical assessments, random drug and alcohol screens, individual therapy, and supervised visitation.

[6]     For a brief period, Mother engaged in random drug screens and met with her home-based case manager. Father did not participate in any services other than supervised visitation. Parents visited Children for a few weeks, but visits stopped in June 2016. On June 10, Parents were arrested on federal charges for committing bank robbery in California and for committing three bank robberies that occurred in Indiana on April 28, May 6, and May 27. Mother pled guilty to the California bank robbery in November 2016 and one of the Indiana bank robberies in October 2017. *See* Ex. DDD. She is currently incarcerated in federal prison in Dublin, California, and her expected release date is January 2022. In November 2016, a jury found Father guilty of the California bank robbery. Then in April 2018, a jury found Father guilty of the April 28, May 6, and May 27 Indiana bank robberies. *See* Ex. CCC. He is currently incarcerated in federal prison in Kentucky, and his expected release date is December 2025.

[7]     In August 2018, DCS filed petitions to terminate Parents' parental rights to Children. A fact-finding hearing was held in February 2019. At the time of the hearing, Parents were serving their federal sentences and testified telephonically. Mother testified that since she has been in prison, she has obtained eleven certificates for completing various classes, including Bible studies, nutrition, and support classes such as Alcoholics Anonymous and

Narcotics Anonymous. Mother said that none of her relatives could care for Children and that she did not want to separate them. *See* Tr. p. 15. Father testified that he has not completed any classes while he's been in prison because he "figured that whatever [he] did, didn't make a difference." *Id.* at 73. Father said that he has been incarcerated many times for "[a] lot of driving while suspended, a couple of failure to appears. . . . a domestic and . . . retail theft, conversion, and . . . burglary." *Id.* at 81.

[8] Family Case Manager (FCM) Shavon Smith testified that she conducted the initial assessment after DCS received a report that Ar.B. was born positive for marijuana and cocaine. FCM Smith said that when she conducted her assessment, Father refused to do a drug test. *See id.* at 31. FCM Titoria Battle testified that she is the family's case manager and has been for the entire case. FCM Battle recommended the termination of Parents' parental rights "[b]ecause [Parents] do[n't] have any stable housing, they cannot financially support [Children], they haven't been with them for going on three years and they haven't completed any of the services recommended by DCS." *Id.* at 45. FCM said that Children have been placed in the same foster home for three years but that Children will be moving to a new pre-adoptive foster home because their current foster mom "fell ill, therefore, she is not able to care for [Children] long term." *Id.* at 46. After FCM Battle testified, the court continued the fact-finding hearing to April.

[9] When the fact-finding hearing resumed, FCM Battle testified that she investigated Parents' relatives as placement options for Children, but none were

able to care for Children. Children's new foster dad, J.O., testified that Children had been with his family for just over a month and had "adjusted very quickly." *Id.* at 87. J.O. said that he and his wife have been wanting to adopt for a long time and that they have "just been so blessed by [Children] and they are doing very well in [their] home." *Id.* at 88. In May 2019, the trial court issued its order terminating Parents' parental rights to Children.

[10] Father and Mother separately appeal.

# Discussion and Decision

[11] When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *In re K.T.K.*, 989 N.E.2d 1225, 1229 (Ind. 2013). Rather, we consider only the evidence and reasonable inferences that are most favorable to the judgment of the trial court. *Id.* When a trial court has entered findings of fact and conclusions, we will not set aside the trial court's findings or judgment unless clearly erroneous. *Id.* To determine whether a judgment terminating parental rights is clearly erroneous, we review whether the evidence supports the trial court's findings and whether the findings support the judgment. *In re V.A.*, 51 N.E.3d 1140, 1143 (Ind. 2016).

[12] A petition to terminate parental rights must allege, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions
>> that resulted in the child's removal or the reasons for

placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove the alleged circumstances by clear and convincing evidence. *In re K.T.K.*, 989 N.E.2d at 1231. If the court finds that the allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[13] Parents first argue that there is insufficient evidence to support the trial court's conclusion that there is a reasonable probability that the conditions resulting in Children's removal will not be remedied. In determining whether the conditions that resulted in a child's removal will not be remedied, the trial court engages in a two-step analysis. First, the trial court must ascertain what conditions led to the child's placement and retention in foster care. *In re K.T.K.*, 989 N.E.2d at 1231. Second, the trial court determines whether there is a reasonable probability that those conditions will not be remedied. *Id.* "The

trial court must consider a parent's habitual pattern of conduct to determine whether there is a substantial probability of future neglect or deprivation." *Id.*

[14] Here, Parents failed to demonstrate that they were any closer to providing Children a safe, stable home than they were at the beginning of the CHINS case in March 2016. The trial court's unchallenged findings on this issue support its conclusion that there is a reasonable probability that the conditions resulting in Children's removal will not be remedied. *See, e.g., In re E.M.*, 4 N.E.3d 636, 644 (Ind. 2014) (findings regarding father's non-compliance with services support trial court's conclusion that conditions resulting in children's removal from father's care would not be remedied). That is, the trial court found:

*****

> Once the children were removed from parental care, [Parents] stopped participating in the services offered through the case plan.

*****

> [DCS] has a history with [Parents] for a sibling whose parental rights were terminated in May of 2012 due to domestic violence issues and [F]ather leaving the infant on the side of the road unattended.

> Both [M]other and [F]ather have a pattern of criminal conduct which the court cannot ignore. There has been a number of incarcerations and both [M]other and [F]ather continue to be incarcerated after receiving lengthy sentences.

Neither parent is available to parent [Children]. Neither parent will be available to parent [Children] in the near future. [Children] have been removed from parental care since April of 2016 and have not seen either of their parents since June of 2016 when [P]arents were arrested. . . .

Neither parent is providing any emotional or financial support for [Children]. Neither parent has completed any case plan for reunification. . . . It is unlikely that either parent will be able to provide the necessary care, support and supervision necessary to parent [Children]. Neither parent is in a position to receive [Children] back into the home.

Appellant's App. Vol. II p. 3. Most notably, Parents' most serious crimes—the bank robberies—occurred while they were under DCS supervision and after Children were removed. Accordingly, the trial court did not err when it concluded that there is a reasonable probability that the conditions resulting in Children's removal and continued placement outside the home will not be remedied.[3]

[15] Parents next argue that the trial court erred in concluding that termination is in Children's best interests. To determine what is in the child's best interests, the trial court must look to the totality of the evidence. *In re A.D.S.*, 987 N.E.2d

---

[3] Because we affirm the trial court's conclusion that there is a reasonable probability that the conditions that resulted in Children's removal will not be remedied, we do not address its alternate conclusion that there is a reasonable probability that the continuation of the parent-child relationships pose a threat to the well-being of Children. *See In re A.G.*, 45 N.E.3d 471, 478 (Ind. Ct. App. 2015) (Indiana Code section 31-35-4(b)(2) is written in the disjunctive and requires the trial court to find only one of the two requirements of subsection (b) has been established by clear and convincing evidence), *trans. denied*.

1150, 1158 (Ind. Ct. App. 2013), *trans. denied*. In doing so, the trial court must subordinate the interests of the parents to those of the child. *Id.* The trial court need not wait until the child is irreversibly harmed before terminating the parent-child relationship. *Id.* "Moreover, the testimony of service providers may support a finding that termination is in the child's best interests." *In re Z.B.*, 108 N.E.3d 895, 903 (Ind. Ct. App. 2018), *trans. denied*.

[16] Here, in addition to Parent's instability, criminal activity that necessitated DCS involvement, and their complete lack of progress since then, FCM Battle testified that terminating Parents' parental rights is in Children's best interests. *See* Tr. p. 45. Furthermore, the trial court found that Children have been out of parental care for almost three years and are bonded and thriving in their placement. *See* Appellant's App. Vol. II p. 3. The trial court also concluded that "[i]t would be unfair to [Children] to delay such permanency on the very remote likelihood of [Parents] being released from incarceration and completing services in the near future. . . . these children definitely deserve permanency, especially in light of the fact that both children are at ages where crucial brain development occurs." *Id.* at 4. Therefore, the trial court did not err when it determined that termination is in Children's best interests. *See In re K.T.K.*, 989 N.E.2d at 1230 (finding that "children have an interest in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, continuous relationships); *see also In re S.P.H.*, 806 N.E.2d 874, 883 (Ind. Ct. App. 2004) (children's needs are too substantial to force them to wait while determining if their parents will be able to parent them).

[17]     Finally, Parents argue that the trial court erred in concluding that there is a satisfactory plan for Children's care and treatment. In order for the trial court to terminate a parent-child relationship, it must find that there is a satisfactory plan for the care and treatment of the child. Ind. Code § 31-35-2-4(b)(2)(D). That plan need not be detailed, so long as it offers a general sense of the direction the child will go after the parent-child relationship is terminated. *Lang v. Starke Cty. Office of Family & Children*, 861 N.E.2d 366, 374 (Ind. Ct. App. 2007), *trans. denied*. Adoption is generally a satisfactory plan, even when a potential adoptive family has not been identified. *See id.* at 375. Part of the reason for this is that it is within the authority of the adoption court, not the termination court, to decide whether an adoptive placement is appropriate. *In re A.S.*, 17 N.E.3d 994, 1007 (Ind. Ct. App. 2014), *trans. denied*.

[18]     Here, DCS's plan is adoption. FCM Battle agreed with this plan. Parents contend that because Children recently moved into a new pre-adoptive placement—because their original foster mom fell ill—that adoption by their new foster family is not a satisfactory plan. However, Children's new foster dad, J.O., testified that Children quickly adjusted to his home and that his family wanted to adopt Children if Parents' parental rights were terminated. *See* Tr. p. 88. Therefore, the trial court did not err in concluding that adoption is a satisfactory plan for Children.

[19]     Affirmed.

Najam, J., and Tavitas, J., concur.